The Lebanon Light, Heat and Power Company *et al. v.* Leap.

## No. 16,449.

## THE LEBANON LIGHT, HEAT AND POWER COMPANY ET AL. *v.* LEAP.

139 443
139 477
139 443
144 359

NEGLIGENCE.—*Natural Gas.—Laying Pipe Line Loose Upon Public High-way.—High Pressure of Gas.—Pipes Poorly Jointed.*—Where it is charged and established that the defendants laid a three-inch natural gas pipe loose upon the public highway, and transported through such pipe natural gas at the dangerous pressure of three hundred pounds to the square inch, the pipe being poorly jointed, and permitting gas to escape therefrom, negligence on the part of the defendants is sufficiently shown.

SAME.—*Joint Tort Feasors.—Parties to Action.—Natural Gas.—Pipe Line.—Personal Injury.—Explosion.*—Where the gas wells were drilled by a sub-contractor, the pipes being furnished by the contractor and put together by the sub-contractor, and after the sub-contractor had ceased to use the pipes and gas for drilling purposes, the agents of the contractor took up the north and south line, which connected with the east and west line, leaving one joint connected with the T, after which the accident happened, the pipe line being then solely the property of the contractor, he must thereafter be held to have assumed the sub-contractor's former charge of caring for the pipe, which, after the accident, was used as a part of a permanent line. And where, before the accident, gas was delivered to the company by the contractor, partly through the pipe line in question, the company, as well as the contractor, is liable, notwithstanding the fact that the contractor had not, at the time of the accident, fully completed his contract, nor formally turned over the plant to the company, which was in actual use of gas which flowed through the pipe in question.

CONTRIBUTORY NEGLIGENCE.—*Natural Gas.—Pipe Line.—Explosion.—Highway.*—Where it appears that at the time the accident occurred, the plaintiff, a boy eighteen years of age, was passing by the crossing of the highways and stopped to look at the burning gas escaping from defendants' pipe line in the highway, unaware of his danger, and that without any act or suggestion of his, but solely by the act of another, and because of the negligence of defendants, the gas exploded, causing plaintiff's injury, the plaintiff was not guilty of contributory negligence.

SAME.—*Erroneous Instruction.—Natural Gas.—Explosion.—Plaintiff's Intermeddling at Previous Times.*—Where, in such case, the court instructed the jury that "Anything any other person may have done

then and there, or at any other time, independently of himself, and for which he (the plaintiff) was not responsible, or anything he may have done himself at any other time or place in way of intermeddling with any of the gas wells or pipe lines of said defendants, or either of them, if either of such acts have been proven, would not affect the right of the plaintiff to recover,"—the *instruction* is too broad, the effect of the instruction being to exclude from the consideration of the jury all former acts of the plaintiff in connection with the wells or the pipe line, and confine their attention strictly to his actions at the time and place of the accident, and was, therefore, erroneous.

From the Hamilton Circuit Court.

*G. Shirts, I. A. Kilbourne, T. J. Terhune, E. P. Schlater* and *J. L. Shelton*, for appellants.

*T. J. Kane*, for appellee.

HOWARD, J.—The Lebanon Light, Heat and Power Company entered into a contract with its coappellant, Charles T. Doxey, according to which the said Doxey was to construct a natural gas plant for the appellant company.

The terms of this contract do not appear from the record.

The appellant Doxey also entered into a contract with his coappellant, John E. Snow, according to the terms of which the said Snow was to drill four gas wells in Hamilton county to supply gas for said gas plant. The wells were to be drilled at such points as Doxey should direct. Snow was to receive six hundred and twenty-five dollars for each well, and was himself to do all the work and furnish all labor, also fuel for the first well. He was to have the privilege of using gas from the first well or wells for drilling purposes. He was to pipe such gas at his own expense, except that Doxey was to furnish him the necessary pipes and fittings.

The four wells were located near the crossing of two highways. The first well was situated near the east and

west highway, and about half a mile west of the crossing. Doxey located well number two near the north and south highway, and about three quarters of a mile north of the crossing. In like manner well number three was located by Doxey, near the east and west highway, and about half a mile east of the crossing. Well number four was not near the highway, but was located about a mile north of well number one.

After drilling well number one, and when well number two was located, Snow laid a two-inch supply pipe on the top of the ground, along the north side of the highway, from well number one east to the crossing, where he put in a T, and thence continued the pipe along the west side of the highway north to well number two.

After well number two was drilled, and well number three located, Snow continued the pipe line from the T at the crossing, east along the north side of the highway to well number three.

At the time of the accident, wells one, two and three had been drilled. The accident occurred September 20, 1890, about two weeks after the completion of well number three. Snow was then engaged at number four, away from either highway.

Soon after well number three had been completed, Doxey's men took up the pipe on the north and south highway, from the T at the crossing north to well number two.

There was then no gas in the pipe at the crossing. Snow was getting his gas from wells one and two, for use in drilling number four; and it does not appear that he had anything further to do with well number three or with the pipe on the highway.

Doxey's assistant testifies that he began taking up the pipe north from the crossing by cutting the second joint

north of the T. They then took two pairs of tongs, one to hold the first joint in place and keep it from turning in the T, while the other tongs were used to unscrew the piece of the second joint which had been cut off. They then plugged up the end of the first joint with a two-inch wooden plug, and went on and took up the rest of the pipe north to well number two.

When cutting the second joint and unscrewing the piece from the first joint, and plugging the end of the latter, they did not examine the T to see if the joint of pipe was tight in it; but it seemed tight. There was no gas on that line at the time.

The T was cast-iron, and of heavier make than the pipe; it would weigh about twenty-five pounds. The joint of pipe left attached to it was about nineteen feet long. It was about twelve feet from the nearest fence.

It does not appear how soon after the taking up of the pipe north of the T that the gas was again turned on, nor does it appear who turned it on, nor for what purpose or use it was turned on. Snow, as we have seen, had not used gas through this line since his completion of well number three, which was about two weeks previous to the accident.

It does appear, however, from the testimony of Frank K. Pierce, an employe of the appellant Doxey, and superintendent of construction of the permanent line to Lebanon, that that line was completed into the city of Lebanon, and gas furnished to the city, in the month of August, 1890, the month previous to the date of the accident.

But for whatever purpose the gas was turned into the pipe between wells one and three after the taking up of the pipe north of the T, it is certain that between that time and the time of the accident the leak of gas at the T was observed frequently. It also seems very probable

that the leak was noticed before the taking up of the pipe; but of this the evidence is not so marked, while it is clear that the leak grew worse from time to time up to the date of the accident.

The appellee was at the time about eighteen years of age, and lived with his father about forty rods south of the crossing.

Several persons testified that they saw gas on fire at the leak in the T on the day of the accident, and at other times previous. John Griffin, who lived near the crossing and who was the father of Warren Griffin, another boy who was hurt at the accident, testified that there had been a leak at the T to some extent ever since the pipe had been laid, and that the leak had been quite bad for some length of time previous to the accident.

Others who had passed there frequently had never noticed the leak before that day. Some had smelled gas for a few days previously, but saw no fire.

John Leap, father of the appellee, had seen it on fire about two weeks before, and had put out the fire with a bucket of water, but had not seen it burning on any other occasion.

The appellee himself testified that he had noticed the leak on fire about two months before the accident, and at different times all along up to the time of the accident. The last time previous he had seen it on fire was on the preceding Monday night; the accident happened on Saturday. On that Monday night, he says, there was a charivari party out, and they stopped for a while near the leak, and some one set it afire. It burned for five minutes or less, when they put it out and went home. He did not touch the pipe or set the gas afire himself; he saw two of the party lift up the end of the link of pipe about four feet, and then let it down again. Appellee next saw the leak afire on the Saturday of the ac-

cident, about ten o'clock in the morning; the blaze was then three or four feet high when he came up to it. The pipe at the T and across the traveled part of the road was covered with about an inch or two of earth; it had been so covered when first laid.

He again saw the leak between 'one and two o'clock that afternoon. He was on his way afoot to Sheridan, a town about a mile north of the crossing. When he came up to the fire, he saw Warren Griffin, a boy about twelve years of age, standing there. He began talking to Warren about the nice time they had at the charivari. He noticed Warren with a small stick, scraping along the dirt where the fire was burning. While they were standing there a neighbor came along with a team going to Sheridan and asked appellee to go along, but he said he was not quite ready. Another neighbor, Mr. Raridan, passed along a minute or two later and made some remark about the fire.

The two boys were standing without talking during this time, when, appellee testifies, he said to Warren: "If that plug was taken out of that pipe it would make a nice fire; he asked what plug, and I went around and pointed to the plug * * * the plug in the north end of the pipe. * * * He walked around to the end of the pipe, and raised the end of the pipe up, somewhere about three inches, and that was the last I knew."

The explosion followed, the joint of pipe being thrown out and the two boys thrown violently back and burned by the gas.

On cross-examination, the appellee testified that he had seen the wells put down, and saw the gas burning at the wells, and knew that it had been turned into the pipe. He had stopped at the crossing a great many times since the pipe was put down. Quite a crowd of boys and girls used to assemble there Sunday evenings.

He never lit the gas or interfered with the pipe himself. He saw the link of pipe lifted up by boys several times, sometimes when the leak was afire; they just raised it up and then let it down. On the night of the charivari, when the gas was lit and two persons lifted up the joint of pipe, he heard his father say: "Boys, I would not do that," and they laid it down. At the time of the accident he told Warren, "if the plug was took out and it was lifted up it would make a nice fire." The earth which Warren was scratching with a stick was burned red, like tile. Warren turned to look at the fire just as he raised the pipe; appellee did not touch the pipe.

Warren Griffin testified that he was at the crossing with his brother before noon on the day of the accident for about five minutes. The blaze at the leak was then about six feet high.

He went down again alone after dinner. Just after he got there the appellee came along, going to town. He had not seen the appellee since the Sunday before, and did not expect him then. They had been there about five minutes before the explosion. They were standing near the end of the link. Appellee said: "If the plug was out of the end of the pipe, and the pipe was raised up, it would make a nice fire. I said 'what plug?' and he showed me, and I lifted the pipe up a little, * * * about three inches." Appellee did not have hold of it.

Thomas W. Raridan, one of the neighbors who passed while the boys were standing near the pipe, testified that after he passed them, going north, he looked back and saw the smaller boy stoop, as if he were about to lift something up. The other boy was standing near by, but not in a stooping position. Just then the explosion took place.

We think that no other evidence given, substantially

changes the facts as we have set them out from the record.

The questions for decision are as to the negligence of the appellants and the contributory negligence of the appellee.

The material parts of the complaint, as presenting the issues on the question of negligence, are the following:

That the appellee was, on and prior to September 20, 1890, "a strong, active, intelligent and energetic young man eighteen years of age, in good health and in full possession of all his faculties, and with good prospects for a long, successful and profitable life."

That "said defendants, a short time prior to the date hereinbefore stated, negligently constructed a gas pipe line along and in the highway * * *, for the purpose of conveying and transporting natural gas through said line, and that said line so constructed as aforesaid was in use and operation by said defendants on said date.

"That said line was made of pipe three inches in diameter, screwed together and negligently laid on top of the ground in said highway. * * * Said defendants negligently and imperfectly and partially screwed one end of the joint of pipe, perhaps twenty feet in length, into said pipe running east and west.

"That said joint of pipe was negligently, loosely and imperfectly inserted and screwed into said pipe line, as aforesaid, in such an insecure and imperfect manner that it was liable at any moment to become disconnected from said line; that the north end of said joint of pipe was plugged and the south end was, as before stated, imperfectly and carelessly inserted into the pipe line as aforesaid.

"That natural gas was, at the time herein mentioned, being negligently conducted by said defendants through

said pipe line, at the high and dangerous pressure of more than three hundred pounds to the square inch.

"That at the place of intersection of said joint of pipe with said line, the gas was, on account of said deficiencies and imperfections, constantly escaping, and was frequently on fire, and that the said line and the said joint of pipe aforesaid were unprotected and unguarded.

"That on the said 20th day of September, 1890, the plaintiff, who was a young man eighteen years old, as aforesaid, and who was passing by said public road crossing and said pipe line, as aforesaid, and who stopped to look at said escaping and burning gas, and had but little knowledge and comprehension of the dangers of handling, using, and transporting natural gas, was in said highway, at or near the point where this joint of pipe intersected with said line, and was at or near the north end of said pipe, and was standing there looking at said escaping and burning gas, and that without fault or want of care on his part, and on account of said negligence and carelessness of said defendants, the said joint of pipe was blown out of said line, and the fire and escaping gas from said line, through said opening, instantly caused a terrible explosion, the flames of said escaping and burning gas, on account thereof, extending to and beyond the plaintiff, who, at the time, was at or near the north end of said joint of pipe, completely enveloping him; and that on account of said explosion and burning gas the said plaintiff was violently thrown a distance of many feet, and his clothing was burned and he was so deeply, seriously, and terribly burned, etc.

"That all of his said injuries were sustained as a result of the said negligence and carelessness of said defendants, and without fault on his part."

This complaint charges, in substance, that the appellants were guilty of negligence in laying a natural gas

pipe, as described, upon the public highway, and in transporting through such pipe, as so constructed, natural gas at the dangerous pressure of three hundred pounds to the square inch. We think the charge is fully sustained by the evidence.

That the pipe was carelessly put together is evident from the numerous leaks, in addition to the one at the crossing, which are testified to. It was additional negligence to lay such a poorly jointed pipe, containing such a dangerous explosive, loose upon the ground, where the public, including children and other inexperienced persons, were passing day after day. Besides all this, it was a violation of the law to lay pipe upon the public highway. Whatever may be said as to the right to lay gas pipe, or other pipe, in covered trenches along the highway, after due permission obtained from proper authority, and so laid as not in any manner to obstruct the highway or endanger public travel, there can be no question that it is unlawful to occupy the surface of the highway as done in this case. The public roads, free from any obstructions to travel, are solely, and from fence to fence, for the use of the traveling public. *Ohio, etc., R. W. Co.* v. *Trowbridge,* 126 Ind. 391; Elliott Roads and Streets, chapter 24.

And we think that the jury were fully authorized, from the evidence, in finding, as they did by their general verdict, that this negligence attached to all the appellants.

Snow actually put the pipe together and laid it in the highway. Doxey furnished him with the pipe and the fittings and located the several wells; and his agents took up the north and south line, cutting and unscrewing the second joint from the first at the crossing. The accident happened after this, and after Snow had ceased to use the pipe, which then belonged solely to Doxey. Doxey

thereafter must be held to have assumed Snow's former charge of caring for the pipe; and he did, in fact, afterwards bury this line of pipe in the highway, using it as a part of the permanent line to Lebanon.

And from the fact that, a month before the accident, gas was delivered to the city of Lebanon from well number one, which, by the pipe passing the crossing, was directly connected with well number three, the jury were amply justified in finding that the gas flowing through this pipe from well number three was taken along with the gas from number one, to be distributed by the appellant company to its patrons in the city.

It does not appear from the evidence, that any other use could be made of the gas; for Snow had ceased to use it before the north and south line was taken up, and two weeks before the date of the accident.

If this inference of the jury, that the company was in the actual use of the gas that flowed over the crossing at the date of the accident, were incorrect, it was the duty of the appellant company to show that fact, and, by introducing upon the trial its contract with Doxey, or by other competent evidence to prove the absence of liability on its part. The evidence adduced makes a *prima facie* case against the company.

As said by Mr. Broom, Legal Max. 939, "Where a party has the means in his power of rebutting and explaining the evidence adduced against him, if it does not tend to the truth, the omission to do so furnishes a strong inference against him."

Notwithstanding, therefore, the fact that Doxey had not at the time fully completed his contract, nor formally turned over the plant to the company, yet the company, being in the actual use of the gas which flowed through the pipe over the crossing, can not escape liability for the negligent manner in which the gas was

conveyed through the pipe thus carelessly constructed along the public highway.

The other question, as to the liability of the appellee, and whether he was himself guilty of negligence contributing to his injury, is one not free from difficulty.

In the complaint it is alleged that "plaintiff was on and prior to the 20th day of September, 1890, a strong, active, intelligent and energetic young man, eighteen years of age, in good health, and in full possession of all his faculties."

It is further alleged, "that on the said 20th day of September, 1890, the plaintiff, who was a young man eighteen years old, as aforesaid, and who was passing by said public road crossing, and said pipe line, as aforesaid, and who stopped to look at said escaping and burning gas, and had but little knowledge and comprehension of the dangers of handling, using, and transporting natural gas, was in said highway at or near the point where this joint of pipe intersected with said line, and was at or near the north end of said pipe, and was standing there looking at said escaping and burning gas, and that without fault or want of care on his part, and on account of said negligence and carelessness of said defendants, the said joint of pipe was blown out, etc.," causing the injury complained of.

While, therefore, the appellee was in the full possession of his strength and faculties, it does not appear from these allegations that on the occasion of his injury he was himself guilty of any negligence. He was at the time on the public highway, where he had a right to be. Whether he walked, or rode in a wagon at the invitation of his neighbor, or whether he stood talking with an acquaintance and watching the gas pipe or any other object, was an affair that concerned himself alone, so long as he did not interfere with the equal right of

any one else to use the highway.   Least of all have the appellants, who had placed an unlawful obstruction upon the highway, a right to complain of his presence.

If, however, it should appear that the appellee were aware of the dangerous character of the obstruction thus placed upon the highway, and notwithstanding such knowledge, should persist in standing in the immediate presence of the danger, and, still more, if he should, in any manner, either by his own act or by suggestion to another, have aided in liberating the dangerous explosive, he could not recover for an injury thus brought about.

It appears from the evidence, that the appellee lived near the crossing, and within a mile of the town of Sheridan, for fifteen years prior to the accident; and that for four or five years previous to that time gas wells were put down in and around that town.   The appellee had been present a few times at the drilling of the first well in Sheridan, also when they fired the second well.   He also knew of the use of gas for fuel in Sheridan, Noblesville, and other points in Hamilton county, prior to the drilling of the wells for the Lebanon Company.   He was also present at the drilling and firing of these wells, and knew that gas was piped around from well number one to well number two.   He saw the size of the flames from the wells and heard the noise.   He had been warned by his father not to light the gas at any of the leaks.   Parties of young people with whom he joined had been in the habit, particularly on Sunday evenings, of congregating at the crossing, lighting the gas, and watching it burn. Appellee says he did not himself light the gas or touch the pipe.   On these occasions he saw the end of the joint of pipe raised up and let down several times, sometimes when the gas was lit and sometimes when it was not.

On the Monday night previous to the accident, he and

his father were with the charivari party at the crossing. He saw the gas lit and the pipe raised up that evening. The fire blazed up two feet or more. He heard his father say at the time, ''Boys, I would not do that,'' and they laid the pipe down.

On the day of the accident, when talking to the boy Griffin, he said to him: ''If the plug was took out and it was lifted up it would make a nice fire.'' On that occasion he noticed the fire stronger than usual, and that the earth near it was burned red, like tile. When he told Griffin about taking out the plug and lifting up the pipe, Griffin said, what plug? and they both walked around to the end of the pipe and he showed Griffin the plug, when Griffin stooped down and lifted up the pipe. Appellee was then standing on one side of the pipe and Griffin on the other, and appellee noticed Griffin turn to look at the fire as he raised the pipe; appellee, at the same time, observed the fire himself. Then the explosion took place.

The appellee does not appear, at the time, to have himself touched the pipe; and, for this reason, perhaps, the jury did not think that he was guilty of contributory negligence. Considering the evidence adduced, it seems very doubtful whether this conclusion was correct.

As bearing on this question, the following, with other instructions given the jury, is complained of:

''7th. On the subject of contributory negligence, the question for your consideration is, whether the plaintiff himself was in fault in any act he did or caused to be done at the time of the accident, if any such act has been proved, which contributed to the injuries sustained by him. Anything any other persons may have done then and there or at any other time independently of himself and for which he was not responsible, or anything he may have done himself at any other time or place in

way of intermeddling with any of the gas wells or pipe lines of said defendants or either of them, if any such acts have been proven, would not affect the right of the plaintiff to recover in this action, unless he was in fault at the time and place when the accident occurred in doing something which contributed to his own injuries.''

This seems too broad. From it the jury were given to understand that anything which the appellee might have done before the date of the accident could not be taken into account. His experience as to the dangerous nature of natural gas, the admonition of his father not to light the leaks, and warning the boys of the charivari party to let the pipe alone, were matters of knowledge which would certainly affect his responsibility on the day of the accident, even though drawn from events that occurred on former occasions. Still more questionable is the clause of the instruction that ''anything he may have done himself at any other time or place in way of intermeddling with any of the gas wells or pipe lines * * * would not affect the right of the plaintiff to recover.''

It was charged as a part of the defense that the working up and down of the joint of pipe on the night of the charivari, and at other times, had so loosened the joint at the T that when, at the suggestion of appellee, Griffin lifted it up at the time of the injury, the loosened and weakened joint suddenly gave way, when but for the disturbances on former occasions it might have withstood the weakening caused by Griffin's raising it up. Whatever may have been the facts as to this, the appellants had a right to make such proof as they were able, and if, in fact, appellee himself, by his own act, or by participating in the acts of others, either on the occasion of the charivari or at other times, had in any degree caused the loosening or weakening of the joint, and so helped to bring the injury upon himself, he ought not

to recover. The effect of the instruction was to exclude from the consideration of the jury all former acts of the appellee in connection with the wells or the pipe line, and to confine their attention strictly to his actions at the time and place of the accident.

We do not think that the error in this instruction is cured in any other instructions given, if, indeed, it could be cured by other instructions. The all important question, after the establishment of the negligence of appellants, is whether the appellee was or was not negligent, and we do not think that his negligence or want of negligence is to be measured solely by what he did on the occasion of his injury.

The error was probably an inadvertence on the part of the learned and accomplished trial judge, but we think it was, nevertheless, calculated to lead the jury away from the consideration of important evidence in the case, and therefore that a new trial ought to be granted. Other alleged errors discussed by counsel need not, as we think, be considered.

The judgment is reversed, with instructions to grant a new trial.

Filed Nov. 27, 1894.