No. 17,396.

THE CONSUMERS' GAS TRUST COMPANY *v.* PERREGO.

NATURAL GAS.—*Damages.—Explosion.—Leak in Main.*—The destruction of a building by the explosion of natural gas which escaped from a leak in a high-pressure main 80 or 90 feet distant across a street, and reached the building by penetrating the soil under its frozen surface, renders the gas company liable, where it had made no effort to prevent the leak, although this had continued for several years, and notice of the fact had been given to line-walkers. (See note at end of opinion.)

SAME.—*Notice.—Leak in Main.*—Ample notice of a leak in a high-pressure main of natural gas is given to the owner of the main by a continuance of the leak for several years, and also direct information given to line-walkers.

From the Marion Superior Court.

*R. N. Lamb* and *R. Hill,* for appellant.

*J. F. Carson* and *C. N. Thompson,* for appellee.

HOWARD, J.—This action was by appellee against appellant and others, to recover for injuries received from an explosion of natural gas.

It is alleged in the complaint, that on the day of the accident, February 14, 1893, and for a long time prior thereto, the appellee was lawfully an occupant of the dwelling house at the southeast corner of Illinois and Twenty-sixth streets, in the city of Indianapolis; that during the whole period of such occupancy the appellant was engaged in drilling and mining for natural gas, and conveying the same to said city by means of high and low pressure mains, service pipes and regulators, laid along and in said Illinois street, immediately in front of and adjacent to said dwelling house so occupied by appellee; that said natural gas, so conducted along and through said

mains, pipes and regulators, subjected the same to a great strain and pressure, to-wit, often of one hundred and fifty pounds to the square inch; that the said gas is of a highly dangerous, penetrating, elusive and explosive nature, and requires great care, caution and perfectly tight mains, pipes and regulators, in order to secure safety in its management and control; all of which was well known to the appellant; that the appellant so carelessly, negligently and unskillfully constructed and maintained its said mains, pipes and regulators that they leaked and permitted said gas to escape from control in large quantities for many weeks in the immediate vicinity of appellee's said dwelling; that such escaping gas percolated and penetrated through the loose sand and gravel until it reached and accumulated in large quantities within the foundations and under said dwelling house, all without the knowledge or fault of appellee; and that the same became ignited without any fault or negligence of appellee, thereby causing a violent explosion within and under said dwelling, completely demolishing the same, destroying the personal property of appellee and causing her great physical and mental pain and injury.

To this complaint a general denial was filed, and the cause was submitted to a jury for trial. On a verdict for appellee judgment was entered in her favor for $6,000.00, and this appeal followed. The only error assigned is that the court overruled the motion for a new trial.

The ground was frozen over solid at the time of the explosion, and the leak from which the gas escaped into the earth was in the large main, at a point where the main was covered by a "sleeve." It appears that in the fall and winter of 1887 the Broad Ripple Natural Gas Company laid its high pressure

main line from the city of Indianapolis, northward along the west side of Illinois street, to the wells from which the gas was obtained. The pipe was an eight-inch screw-joint, wrought-iron pipe. In constructing the line, the company had a force of men laying pipe from the city north, and another force laying pipe from the field to the city; and these two forces met a little south of the house under which the explosion afterwards took place. At the point of intersection the pipes could not be screwed together; but the ends were brought up close and connected by a "sleeve." The sleeve was fitted over the ends so brought together and caulked with lead.

The appellant purchased the Broad Ripple line in July, 1889; and the main question for decision is whether appellant was careless and negligent in the purchase, inspection and maintenance of the line during the three years and a half from said purchase until the accident in February, 1893.

The evidence submitted to the jury on this question is exceedingly voluminous. It appears that there was no connection by pipe between appellant's main and appellee's house. The latter was supplied with gas by the Indianapolis Natural Gas Company, which company had its gas main also in Illinois street and close to appellant's line. The location of the sleeve on appellant's pipe, where the gas leaked, was across the street and about ninety feet distant from appellee's dwelling. The sleeve was smooth on the inside, as was the pipe on the outside. The inner diameter of the sleeve was an inch and a half greater than the outer diameter of the pipe over which it fitted. This open space was filled in with lead. There was evidence that there had been a leak at this point and that the gas escaped through the earth from the first laying of the pipe, six years before the explosion. It

is the theory of the appellee that during all these years the gas permeated the surrounding earth; that it escaped more readily from the surface during the summer, but that when the ground was frozen over the gas was forced to greater distances under the hardened crust. At the time of the purchase of the line by the appellant, a test of the line was made by turning on full gas pressure, being nearly or quite three hundred pounds to the square inch. It is argued that there being a leak, even at that time, under the sleeve, the great pressure thus turned on still further opened or displaced the lead between the pipe and the sleeve, and consequently that the escape of gas was greater after that test.

Counsel for appellant, in arguing that there was no negligence in the purchase, care and maintenance of the pipe line, contend: (1) That appellant employed as superintendent of its pipe lines and gas wells a man of large experience in such work; (2) that before the purchase from the Broad Ripple company the line was carefully tested and found in good condition; (3) that appellant did not know, and had no means of knowing without digging up its entire line, of the existence of the sleeve in question; (4) that after the inspection and purchase of the line, the appellant, by its line walkers and other employes, kept up a careful supervision and inspection of its pipe lines, including that on Illinois street, almost every day up to the time of the explosion; (5) that the line was properly laid, and the sleeve and joint were properly and skillfully constructed; and (6) that the "appellant did not know of the existence of the sleeve, or of a leak at that point, until after the explosion. Its employes, Watson, the foreman of field work, laying pipe, making repairs, etc., and the line walkers, Reichert and Harri-

son, who walked over the line every few days, had never discovered any evidences of a leak at that point, though it was their special business to look for leaks."

The first, second, third and fifth of these contentions have reference chiefly to care exercised in testing and discovering the condition of the line at the time of its purchase from the Broad Ripple company; while the fourth and sixth relate chiefly to care exercised by the appellant in the inspection and repair of the pipe line after its purchase.

On appeal all presumptions are in favor of the judgment; and if there is sufficient competent evidence to sustain it, the verdict will not be overthrown by reason of any conflict in such evidence.

Mr. Shackleton, general superintendent of the appellant company, and who had full charge of the lines and wells, gave as the only test on examination of the condition of the line made at the time of the purchase from the Broad Ripple company, that a full pressure of about three hundred pounds was turned on at the wells; and he said that the line "stood the pressure all right, apparently," and that he did not know of any leaks thereby disclosed. He also knew, he said, that the main pipe was eight inches in diameter. And he said that he did not learn of the existence of the leak until a few days after the accident. At the time of the purchase he did not, as he testified, make any inquiry as to the location of "sleeves" on the line. They received from the Broad Ripple company a surveyed chart of the line; but he did not examine it particularly. The chart does not seem to have been produced on the trial, although in possession of the appellant company. Mr. Shackleton had never looked on the chart for sleeves, but said he knew from what he saw that they were not indicated on the chart. He did not make inquiry of anyone for sleeves, and did

not find out whether there were any on the line or not. In the city they do ordinarily keep memoranda of all sleeves, so that if there is a break or a leak they can examine the memoranda and determine where it is located. They had never examined the place where the leak was at the sleeve in question. No repairs had ever been made by the company at that point, from the time of the purchase until after the explosion.

Mr. Watson, general foreman of the company and assistant of the superintendent, in charge of all repairs, testified that after the explosion he had the earth dug up at the sleeve and found a leak on the under side of the sleeve, between the sleeve and the pipe, where the lead seemed to have been "drawn out." He had the leak caulked by hammering the lead all back in tight with caulking tools. It has not since leaked. He found the earth all around blackened with the gas, and thought it would take some time to discolor the earth in that way.

Mr. Lyman, the secretary, testified that there is but little gas turned on the main line in summer, and that there is no regular inspection during that time.

Mr. Everett, who lives in the neighborhood, and who was a witness for the appellant, had smelled gas on the street for a long time, but he thought it came from a "regulator" below Twenty-sixth street, or from one above that street.

Mr. Reichert, a line walker of the company, whose business, among other things, was to examine the line for leaks and to caulk them when found, testified that soon after he went on the line, a few months before the explosion, he smelled gas a few feet north of Twenty-sixth street, but he thought it came from a regulator about 200 feet further north.

Mr. Harrison, another line walker, was at one time

told by a Mr. Watson, riding by in a buggy that he smelled gas near Twenty-sixth street; but Mr. Harrison testified that he could not discover any leak, and did not report the matter to the office. At other times he smelled gas himself, but thought it came from a regulator. This was about two years before the explosion.

Mr. Page, a witness for the appellant, and who lived on Illinois street, near Twenty-fifth street, had frequently smelled gas near the locality of the sleeve; but, until the explosion, had no knowledge as to where it came from.

Appellant's evidence shows only irregular inspection of the line, except in cold weather, at which time, it is admitted, it would be difficult to detect leaks in the main line, for the reason that the gas could not penetrate to the surface through the frozen ground.

Appellee produced a multitude of witnesses, amongst them one of the contractors and other persons who had aided in digging and covering up the trench when the Broad Ripple line was first laid; also plumbers, gas-fitters and others who had occasion to pass along the sidewalk where the sleeve was placed; also very many neighbors and other persons residing on the street, in the immediate vicinity. These witnesses, without an exception, testified that there had been a gas leak at the sleeve almost from the time the main was first put down, six years prior to the explosion. It was matter of common talk in the neighborhood. The odor was sometimes so strong that passers-by crossed the street to avoid it. One witness, in going along the sidewalk in the evening with a lantern, turned out the light at that point for fear of setting fire to the escaping gas. Several of the witnesses had, at different times, seen the gas on fire as it came up through the earth, as if kerosene oil had been

poured out and was burning on the ground. After rains, and when water stood in the gutter, the gas was often seen to bubble up through the water.

In at least two instances, appellant's agents, the line walkers, Reichert and Harrison, were notified of the escaping gas at the sleeve and asked to repair the leak. No repairs, however, were ever made at that point until after the explosion.

To say nothing of the notice directly given to appellant's line walkers, it would seem that the continuous leak of gas at this sleeve for the whole period of six years, and particularly during the three years and a half from appellant's purchase to the date of the accident, was ample notice to the company of the existence of this dangerous defect in its high-pressure main.

The appellee testified as to the particulars of the accident; that it occurred in the evening; she had lit the lamp; there was no one else in the house at the time; she had need to go to the cellar to take down a crock of milk; she opened the cellar door, and set the lamp on a bench near by, to show light down the cellar-way; as she went down she thought the light grew dimmer; and as she returned, when half way up the stairs, she looked up at the lamp standing on the bench and saw that the light had grown small and burned blue; immediately after, and before she reached the top of the stairway, she saw the lamp blaze up. She remembered no more until she found herself fastened in the ruins of the house, which had blown up and was already on fire. Her neighbors extricated her from the wreckage. She had not smelled the gas, having been deprived of the sense of smell for many years, and she had no thought of there being any gas in the cellar.

As the house was supplied with gas by the Indian-

apolis company, it was thought at first that the explosion had been caused by an escape from that company's pipes. Accordingly, the Indianapolis company spent some time uncovering its service pipe from the house across the street, and also its main pipe for some distance, but found no leak.

It was sixteen days after the explosion that the appellant company began to uncover its main to discover whether there was a leak there; and on uncovering the pipe at the sleeve the gas rushed out from the leak with great force.

During the whole period of sixteen days, from the explosion to the uncovering of the sleeve, the escaping gas continued to burn in jets from two to eight inches high, all around the inside of the north, south and west foundation walls of appellee's house. The gas came out between the brick and from the ground along the bottom of the walls. Within two minutes after the uncovering of the sleeve, as the evidence shows, the jets of gas in the foundations of the house ceased to burn; and no gas could be discovered there afterwards.

The earth around the sleeve was found blackened with gas. The ground was frozen above the pipe, and the pipe itself lay in loose gravel and sand. There can be no doubt, as the jury found, that the gas passed from the leak in the sleeve through the loose soil until it reached the foundations of appellee's house, eighty or ninety feet distant, across the street.

Counsel for appellant say that appellee was negligent in not notifying the company of the leak. The leak was across the street from appellee. She did not receive her gas from the appellant. It is hard, therefore, to understand how she should have thought that the leak at appellant's sleeve, ninety feet distant, even if she knew of its existence, which does not ap-

pear from the evidence, could have been the source of any danger to her.

Other matters are discussed by counsel, including the instructions of the court; but we are unable to discover any substantial error for the reversal of the judgment. The rulings of the court throughout the trial and the instructions were quite as favorable as appellant could ask; and in view of the almost uncontradicted evidence, we are unable to see how the jury could have reached a different conclusion.

As to liabilities of parties in cases of explosions of natural gas, see, generally, *Gas Fuel Co.* v. *Andrews,* 50 O. St. 695 (29 L. R. A. 337); *Lebanon Light, Heat and Power Co.* v. *Leap,* 139 Ind. 443 (29 L. R. A. 342); *McGahan* v. *Indianapolis Nat'l Gas Co.,* 140 Ind. 335 (29 L. R. A. 355); and especially the exhaustive and valuable note to those cases in 29 L. R. A. 337.

Judgment affirmed.

Filed March 26, 1896.

NOTE.—The liability for negligence in the escape and explosion of natural gas is considered at length in a note to *Gas Fuel Co.* v. *Andrews* (Ohio), 29 L. R. A. 337.