NORTHERN INDIANA PUBLIC SERVICE CO. AND
JOHN DEHNER, INC. *v.* REGINA OTIS.

[No. 468A78. Filed August 27, 1969. Rehearing denied September 23, 1969. Transfer denied May 14, 1970.]

160

*J. A. Bruggeman, William F. McNagny, Robert L. Thompson, Jr.,* of Fort Wayne, for appellant N.I.P.S.Co.

*John H. Kruecheberg, Gary A. Buelow, Parry Krueckeberg & George Freuchtenicht, Rothberg, Gallmeyer, Freuchtenicht & Logan,* of Fort Wayne, and *Arch N. Bobbitt, Ruckelshaus, Bobbitt & O'Connor,* of Indianapolis, for appellant John Dehner, Inc.

*Gilmore S. Haynie, David B. Keller, Marvin S. Crell,* of Fort Wayne, and *Livingston, Dildine, Haynie & Yoder,* of counsel, of Fort Wayne, for appellee.

SHARP, J.—This case grew out of an explosion of a gas main at the corner of Broadway and Kinsmoor, also known as Old Mill Road, in the downtown area of Fort Wayne, Indiana, on February 3, 1966, near the residence of Plaintiff-Appellee, Regina Otis. Appellee filed her complaint on August 25, 1966, for personal injury damages as a result of said explosion, which as amended, in substance, alleges:

1. The plaintiff was a resident of the City of Fort Wayne; Appellant Northern Indiana Public Service Company, hereinafter caled NIPSCO, was an Indiana corporation engaged in the business of transmitting, distributing and selling gas, and the Appellant John Dehner, Inc., hereinafter called Dehner, was an Indiana corporation engaged in the general contracting and construction business in and about the City of Fort Wayne.

2. The Appellants entered into an agreement whereby NIPSCO employed Dehner to construct and install gas mains, which agreement provided that Dehner should perform such work under the supervision of NIPSCO's Engineers using materials furnished by NIPSCO and pursuant to plans and specifications furnished by NIPSCO.

3. That pursuant to the agreement Dehner constructed and installed a twelve inch gas main running under Broadway Avenue and past the residence of the plaintiff.

4. That upon completion of the gas main NIPSCO used it for the transmission and distribution of gas until February 3, 1966.

5. That Broadway Avenue is a principal motor traffic artery, carrying State Roads #1 and #3 and is heavily traveled by automobiles and trucks.

6. That plaintiff's home was immediately south of the intersection of Broadway with Kinsmoor Avenue and that at said intersection Broadway curves in a generally southwesterly direction as viewed from the north.

7. That at the intersection of Broadway with Kinsmoor the gas main was placed in a trench that was curved in such a manner as to correspond with the curve of Broadway Avenue, and that two sections of pipes were joined by a weld beneath the intersection.

8. On or about February 3, 1966, that weld failed, and that as a result of such failure high pressure gas escaped in large quantities and exploded, and as a result the plaintiff suffered injuries.

9. That the failure, explosion, and injuries were caused by the negligence of the defendants.

10. That NIPSCO was negligent as follows:

a. In requiring that the main be installed in such a manner, it was curved at such an angle and at such a depth that NIPSCO should have known would produce stress upon the weld capable to cause failure of the weld;

b. That NIPSCO failed to furnish Dehner with an elbow and/or permitted Dehner to join said sections of pipe without using an elbow when it should have know that the use of an elbow was reasonably necessary;

c. That the bituminous wrapping material furnished by NIPSCO to Dehner to wrap the weld was not of sufficient quantity or quality to prevent corrosion and weakening of the weld;

d. That NIPSCO allowed the weld to be wrapped in a manner ineffective to prevent corrosion of the weld;

e. That NIPSCO failed to properly test and/or inspect the weld during construction.

f. That while the gas main was in use, NIPSCO failed to properly test and/or inspect the weld;

g. That NIPSCO failed to equip the gas main with the devices which would have cut off the flow of the gas in the event of a leak which devices were reasonably available in the industry and reasonably necessary to prevent the creation of hazardous conditions;

h. That, immediately prior to the explosion NIPSCO failed to cut off the flow of gas into the main even though it knew or should have known that there was a leak in the main and that high pressure gas was escaping.

11. That Dehner was negligent as alleged as to NIPSCO in sub-paragraphs a, b, c, d and e above and also, in failing to properly test or inspect the weld.

Appellant NIPSCO filed answer in admission and denial under Rule 1-3 of the Rules of the Supreme Court of Indiana, Appellant Dehner filed an amended answer in five legal paragraphs.

The first pleading paragraph was in admission and denial under Rule 1-3 of this Court, and contained the specific allegation that the employees of the Appellant Dehner were furnished to the Appellant NIPSCO and the Appellant Dehner did not undertake nor was it given the responsibility for determining the adequacy of the procedures specified by the Appellant NIPSCO, all of which was reserved to itself by NIPSCO and its construction and engineering department.

In its second paragraph of answer, the Appellant Dehner, averred specifically that any damage suffered by the plaintiff was due solely to the negligence of NIPSCO in failing to properly design, plan, test and inspect the line.

In his third paragraph of answer, Appellant Dehner specifically alleged that the contract, referred to in the Appellee's complaint, between the Appellants provided only for the

furnishing of labor and equipment to NIPSCO to be used by NIPSCO for certain work to be done under the direction, supervision and inspection and control of NIPSCO and in accordance with their instructions. It was further stated that the workmen furnished to NIPSCO by Dehner performed only such work as they were instructed to perform by NIPSCO, and that Dehner was furnished with no plans and did not undertake to test or determine the adequacy of the procedure specified to its workmen by NIPSCO, and that the manner, method and means of performance of the work was under the sole direction, control, supervision and inspection of NIPSCO.

In its fourth paragraph of answer the Appellant Dehner pointed out that when the line was completed and installed it was tested by NIPSCO, approved by NIPSCO and accepted by NIPSCO and has ever since been in their exclusive custody, supervision and control, and that Dehner has had no control, supervision or interest therein, knowledge thereof, access thereto or responsibilty therefor since that time. Dehner further averred that when the line was tested, approved and accepted by NIPSCO, NIPSCO assumed fully all control, supervision, interest, knowledge, access and responsibility for the gas main and was alone in privity with the plaintiff.

In its fifth paragraph of answer Appellant Dehner specifically alleged that any condition permitting the escape of gas from the main was the result of matters arising after the completion of the line which were not in the control of Dehner, which arose without its fault, and which include but are not limited to any one or more of the following causes:

a. Failure on the part of NIPSCO to periodically inspect its line for defects which might have arisen from natural causes, from the increased load of traffic on Broadway or from improper utilization of the line by NIPSCO.

b. Improper use of the line by NIPSCO in using it to transmit gas at a pressure greatly in excess of that contemplated

by the specifications and testing procedure originally employed by Dehner.

c. The activity of natural corrosive elements and forces and the increased stress to which said line was subject as a result of the increased traffic load on Broadway, all of which forces not being within the contemplations of the plans and specifications of NIPSCO.

This case was tried by jury which resulted in a verdict for Appellee against both NIPSCO and Dehner in the sum of $235,000.00.

On December 14, 1967, NIPSCO filed its motion for New Trial.

On December 19, 1967, Dehner filed its Motion for New Trial.

Both Motions for New Trial were overruled, which is the sole assignment of error here.

We should emphasize that NIPSCO's counsel in oral argument admitted NIPSCO's liability to Appellee for this explosion. In a reply brief in this court NIPSCO stated:

"In view of the extensive briefs already before this Honorable Court, we will spare it the burden of another such brief.

"Appellant NIPSCO concedes that Appellee is correct in her contentions that Appellant Dehner has failed to establish any harmful error in the record and that its brief is devoted principally to complaining about rulings which Dehner invited. The other errors urged by Appellant Dehner are remarkable only for their quantity and not for their quality.

"Dehner's principal contention is that the loan agreement is, in some mysterious way, improper apparently because it changed Appellant NIPSCO from an ally to an adversary We know of no rule of law or moral principal which requires two defendants to be allies—certainly not in a case like this which shows on the record that Dehner defrauded NIPSCO by not constructing the gas main in a good and workman-like manner and then tried to unload full responsibility on NIPSCO by repudiating the written agreement under which it performed the work and by adamantly re-

fusing to accept any responsibilty to the public for injury and damage caused by its negligence. On such a record, no court of justice should require NIPSCO to be Dehner's ally or to assist it in avoiding its responsibilities to the innocent public including Mrs. Otis.

"Appellant NIPSCO, however, does not concede that the error urged by it is moot because of the jury verdict against Appellant Dehner. The error urged by NIPSCO could not become moot until the judgment against Appellant Dehner is affirmed, as it should be.

"In the unlikely event that the court should find any merit in any of the errors urged in the voluminous brief of Appellant Dehner, then the errors urged by Appellant NIPSCO are not moot and it should prevail in its appeal for the reasons urged in its original brief.

"WHEREFORE, we pray that in the event that the judgment against the Appellant Dehner is not affirmed in all things, the judgment of the court below against Appellant NIPSCO should be in all things reversed."

Since NIPSCO is obviously not serious about its assertions in its Motion for a New Trial, we are not going to burden this opinion with a point by point exposition of them, although we will cover most of them in the course of this opinion.

The principal dispute in this case is between NIPSCO and Dehner as to which is responsible for Mrs. Otis' injuries.

The Appellant Dehner has grouped its contention for purposes of this appeal under 14 Propositions. Consistent with our obligation we shall consider each of these 14 propositions and in doing so will cover all the essential issues involved in this appeal.

### PROPOSITION I

Dehner contends error in denying it a trial separate from NIPSCO. The principal contention in support of a separate trial was a so-called loan receipt agreement made between NIPSCO and Mr. and Mrs. Otis which provided:

"WHEREAS, Delbert Otis and Regina Otis are husband and wife and residents of Fort Wayne, Indiana; Northern

Indiana Public Service Company ('NIPSCO') is a public utility, engaged, among other things in supplying natural gas to residents of Fort Wayne, Indiana; John Dehner, Inc. ('Dehner') is a construction company; and

"WHEREAS, in the year 1951 NIPSCO, embarked upon a construction program which included the installation of a main for the transmission of natural gas under a portion of a certain thoroughfare in Fort Wayne known as 'Broadway.' NIPSCO, and Dehner entered into a written agreement dated July 16, 1951, under which Dehner agreed to install said main; Dehner in fact installed said main; and

"WHEREAS, a gas explosion occurred in said main on February 3, 1966, allegedly inflicting severe and painful injuries upon Regina Otis and allegedly causing consequential damages in a large amount to her husband, Delbert Otis; and

"WHEREAS, Regina Otis has brought an action in the Allen Superior Court No. 3, Allen County, Indiana, to recover for her injuries and for the resulting pain and suffering of which action bears the Cause No. 11540; Delbert Otis has brought an action in the Superior Court of Allen County, Allen County, Indiana, to recover for his consequential damages; Dehner and NIPSCO, are joined as Defendants in each action; and

"WHEREAS, the complaint in each action is drafted upon the theory that said explosion was caused by negligent acts and omissions on the part of each of the defendants and that the defendants are jointly and severally liable for the damages suffered by the plaintiffs; and

"WHEREAS, NIPSCO denies that it was negligent in such manner as to cause said explosion and denies that it is liable to the plaintiff in either of the aforesaid actions; but NIPSCO realizes that it might be unable to establish that it is not liable; and so NIPSCO maintains in the alternative, a) that any liability on its part is secondary; b) that Dehner is primarily liabel to Regina Otis and Delbert Otis; c) that NIPSCO would be entitled to indemnity from Dehner for any monies it might pay Regina Otis and/or Delbert Otis, either as the result of a judgment in the aforesaid actions, or either of them, or as the result of a compromise and settlement; d) that NIPSCO would be entitled to such indemnity both expressly under the terms of the aforesaid written agreement dated July 16, 1951, and impliedly under the principles of law applicable when one secondarily liable makes payments to satisfy in whole or in

part an obligation for which another is primarily liable; and

"WHEREAS, NIPSCO recognizes that the facts are such as to provide a substantial possibility that the plaintiff will be awarded judgment against each defendant in each of the aforesaid actions; NIPSCO further recognizes that any such judgment would, in all probability, be for a large sum of money, particularly in the action brought by Regina Otis where any judgment for her would probably be in excess of $50,000.00; and

"WHEREAS, NIPSCO recognizes that the plaintiff in each of the aforesaid actions could if awarded judgment against each defendant execute the same, in whole or in part, against NIPSCO as he or she chose; that the plaintiff would not have to collect any part of such judgment from Dehner unless he or she wished; that the plaintiffs' rights with regard to the collection of any such judgment would be unaffected by NIPSCO's assertion that any liability on its part is secondary; and

"WHEREAS Delbert Otis and Regina Otis believe that their position in each of the aforesaid actions is strong but they recognize that the ultimate disposition of said action, including appeals, is probably at least three years in the future, particularly inasmuch as Dehner has pursued a policy of delay from the very inception of the aforesaid litigation; pursuant to such policy of delay Dehner has filed frivolous pleadings and Dehner has otherwise manifested a defiant attitude toward the Rules of the Supreme Court of Indiana and the Rules of the Allen Superior Court No. 3; that on one occasion the Allen Superior Court No. 3 entered a default judgment against Dehner because of Dehner's obdurate refusal to plead, removing same from the docket sheet prior to the time it was typed into the order book only because Dehner was immediately advised of such entry and filed a pleading before the persons in charge of the order book had had an opportunity to type the entry into the order book; Dehner is continuing its policy of delay and there is no reason to expect any change until the ultimate disposition of the litigation; and

"WHEREAS, Delbert Otis and Regina Otis realize that any judgment in their favor would not have to be satisfied until the ultimate disposition of the litigation; their investigation to date indicated that NIPSCO is correct in its assertion that any liability on its part is secondary, that Dehner is primarily responsible for the aforesaid explosion and

that Dehner is primarily liable in each of the aforesaid actions; and

"WHEREAS, Dehner is one of the largest general contractors in the area and is financially able to pay substantially more than the prayer in the Otis complaints, without financially impairing Dehner, and

"WHEREAS, Otis and NIPSCO are desirous of reaching an agreement which would enable Delbert Otis and Regina Otis to receive monies at the present time without jeopardizing the claims against Dehner alleged in the aforesaid actions and which agreement would limit NIPSCO's ultimate liability without affecting its rights to indemnity from Dehner;

"NOW, THEREFORE, in consideration of the promises, and in consideration of the promises hereinafter expressed, it is agreed by and between Delbert Otis and Regina Otis on the one hand and NIPSCO on the other that:

"1. Contemporaneously with the execution of this instrument NIPSCO will advance to Delbert Otis and Regina Otis jointly the sum of $50,000.00, as a loan, without interest, repayable only in the event and to the extent that Delbert Otis and Regina Otis, or either of them, receives a recovery (over and above the costs of litigation, including by way of illustration and not of limitation, court costs and experts' and physicians' fees for consultation and appearance at trial but not including attorneys' fees) from Dehner by reason of the above described injuries and damages.

"2. Delbert Otis and Regina Otis agree that they will pursue the aforesaid actions diligently; that, in the event judgment is awarded against both defendants in either or both of said actions, they will not cause any execution to issue against NIPSCO by reason of any such judgment. In the event either or both of said actions results in a judgment against NIPSCO alone, the plaintiff in such action may levy execution against NIPSCO but only for the sum by which such judgment exceeds $50,000.00.

"3. Delbert Otis and Regina Otis further agree that they will not initiate suit against NIPSCO or in any manner demand, claim, accept or receive any monies from NIPSCO by reason of the aforesaid explosion and the resulting injuries and damages other than as hereinabove provided.

"It is understood and agreed by and between the parties that this agreement does not effect a release of the claims of Delbert Otis and/or Regina Otis against NIPSCO and it is further understood and agreed that the parties do not

intend to, nor do they, relinquish their respective claims against Dehner but each of the aforesaid actions shall be prosecuted diligently, as hereinabove stated, and NIPSCO shall take whatever steps it deems necessary to protect and assert its rights to indemnity against Dehner and actively contest any liability against it.

"This agreement shall be binding upon the parties hereto and their respective successors, heirs and assigns.

"Dated this 25 day of Sept., 1967."

Dehner's Motion for Separate Trial filed October 26, 1967, stated:

"1. The plaintiff herein, Regina Otis, and the defendant Northern Indiana Public Service Company have entered into a settlement, a copy of which was mailed to this Court on or about the 29th day of September, 1967, and is contained in the packet file with the pleadings herein in this case. A further copy of such settlement was mailed to the Superior Court of Allen County and filed of record in Cause No. 93129 in said Court filed by Delbert Otis, husband of the plaintiff herein, Regina Otis, against Northern Indiana Public Service Company and John Dehner, Inc., for expenses and loss of consortium, that being a companion case hereto.

2. That by virtue of certain of the provisions of said settlement agreement, which provisions are set forth in Exhibit 'A' attached hereto and made a part hereof, and the payments made thereunder, the defendant Northern Indiana Public Service Company has acquired a financial interest in the cause of action of the plaintiff Regina Otis against the defendant John Dehner, Inc., inconsistent with and incompatible with its status as a co-defendant in this action which remains pending. Because of its affect upon the relationship of the parties in the instant action, this defendant John Dehner, Inc., cannot have a fair and impartial trial and hearing of its case and defense upon the claim of Regina Otis until the status and liability of the defendant Northern Indiana Public Service Company for negligence is first determined and resolved. That because of the financial interest which the said defendant has acquired in the plaintiff's cause of action, said defendant Northern Indiana Public Service Company will be constrained to conduct itself in the trial of the within cause in such a fashion as to be unfair to the position of this defendant, John Dehner, Inc., and this defendant will be precluded

from explaining said conduct of Northern Indiana Public Service Company to the jury which shall hear said case because of the nature of the agreement as a settlement and because of numerous self-serving scandalous and highly prejudicial references to this defendant and its cause and because of the establishment of a high level of damages.

4. That defendant John Dehner, Inc., believes that said agreement, arrangement or settlement and the great publicity which said agreement has received, and the manner in which said agreement was communicated to this Court and the Allen Superior Court No. 1 is against public policy, obstructive of justice, contrary to law, and grossly prejudicial to this defendant's right to a fair and impartial determination of its rights of the allegations made against it, and of its defense. Without attempting to limit the characterization of or the effect of said agreement, arrangement or settlement, it is a device by an alleged tort feasor apparently attempting to isolate itself from any responsibility as a tort feasor although it be declared one, as well as a device for the participation in the financial benefits of a judgment against a joint tort feasor, and induces it to encourage a substantial judgment in excess of the amount of their investment therein while seemingly maintaining a position adverse to the plaintiff, all as a result of obtaining a direct financial interest in both sides of the pending controversy."

This motion was overruled by the trial court.

It must be emphasized that the only manner in which the so-called loan receipt agreement was before the trial court for any ruling was as a basis for a separate trial. All of the parties to this case and the trial judge were fully aware of the contents of the loan receipt agreement because a copy was filed with the trial court immediately after its execution and was served on Dehner. Dehner chose not to offer it into evidence at the trial, *or any part thereof*. Therefore, the jury was not aware of the contents of this loan receipt agreement. The granting of separate trials is within the sound discretion of the trial court. In the *City of Indianapolis* v. *L. & G. Realty and Constr. Co.*, 132 Ind. App. 17, 170 N. E. 2d 908 (1961), we found no abuse

of that discretion in denying separate trials. More recently, in *Central Indiana Railway Co.* v. *Anderson Banking Co.*, 143 Ind. App. 396, 240 N. E. 2d 840, 853 (1968), we stated:

"Trial judges have discretion in granting or refusing motions to separate causes against defendants which action is reviewable on appeal but which will not be reversed unless an abuse of discretion is shown. The burden of demonstrating such an abuse and prejudicial results is upon the appellant . . ."

In *Preuss* v. *McWilliams*, 141 Ind. App. 602, 230 N. E. 2d 789, 792 (1967), this court stated:

"The term 'discretion' implies the absence of a hard and fast rule or mandatory procedure regardless of varying circumstances. 'Discretion' of a court is a privilege allowed a judge within the confines of justice to decide and act in accordance with what is fair and equitable. Thus, judicial action which involves discretion is final and cannot be set aside on appeal except when there is an abuse of discretion."

See also, *Mass. Bonding and Ins. Co.* v. *State*, 82 Ind. App. 377, 149 N. E. 377 (1925).

Economy of time, money and effort requires, if practicable, that the whole controversy be determined by one trial. It is the policy of the law to limit the number of trials as far as possible. *Hoesel* v. *Cain*, 222 Ind. 330, 53 N. E. 2d 769 (1944).

In this context the statement of this court in *Black* v. *Marsh*, 31 Ind. App. 53, 67 N. E. 201 (1903), is pertinent:

"The third assignment is that the court erred in overruling appellant's motion for a separate trial. The suit was brought against two persons as joint tortfeasors. The appellant might have elected to sue one of them without joining the other. *Hoosier Stone Co.* v. *McCain*, 133 Ind. 231, 31 N. E. 965. Having joined them, he was entitled to a trial of the issue and judgment in accordance with the proof made. Section 577 Burns' 1901. No error was committed in overruling the motion." 31 Ind. App. at 54, 55, 67 N. E. at 202.

This also is consistent with the weight of authority as collected in 174 A. L. R. 734, 735:

"As will be gathered from the cases as a whole, two or more joint tortfeasors sued together as such are not entitled as a matter of right to severance or separate trials, and a severance or grant of separate trials is discretionary with the trial court whose action in denying a severance will not be set aside by the Appellate court unless it is clearly an abuse of discretion and is not in furtherance of justice."

In the proper exercise of its discretion regarding separate trials, the court had a right to consider the imposition of two trials on *all* the parties. The trial court could have considered the burden of two trials upon a seriously injured plaintiff whose rights were no less important than those of Dehner and NIPSCO. The trial court could have properly determined that in the interests of justice, the issue as to negligence of either or both of the joint tortfeasors should be presented in one trial. It could have determined that this plaintiff who in no manner caused this explosion should not, in a forced separation, be put to the hazard of two juries, each believing the absent tortfeasor was the wrongdoer.

The trial court did not abuse its discretion in denying Dehner's motion for separate trial. The Indiana authorities are certainly adequate to support the decision of the trial court but the principles applicable are well summarized by the Supreme Court of Iowa in *Way* v. *Waterloo, Cedar Falls and Northern R. R.*, 239 Ia. 244, 29 N. W. 2d 867 (1947):

"The plaintiff's right to join tortfeasors in a single action will not be taken away to suit the convenience of the defendants or either of them, nor will it be taken away to avoid prejudice in the sense that in a joint suit one defendant will be in a more unfavorable position than he would be in a separate suit. Before the plaintiff's right to sue tortfeasors in a single action will be taken away there must be an affirmative showing that a legal prejudice either will result or will likely result from a joint trial; that the joint trial will result in depriving a defendant of some substan-

tial right, not available to him in a joint trial, but one that would be available to him if the cause as to him were tried separately. With such a showing there would be a substantial right of the plaintiff and of the defendant moving for severance involved, and the decision should rest in the discretion of the trial court.

\* \* \*

"We are not unmindful of the fact that the railroad will possibly be at some disadvantage in the joint trial. But the railroad will have the right to urge every defense it would have in a separate trial. The court cannot anticipate that the instructions will confuse the jury. We suspect the chief disadvantage will be the inability in a joint trial to shift the entire responsibility upon the other co-defendant. That is an advantage that the railroad should not have under the pleaded case of joint liability based upon actual joint perpetration by the two concurring parties.

\* \* \*

"In the interest of justice, the issue as to negligence of either or both of the joint tortfeasors should be presented in one trial. Plaintiff should not, in a forced separation, be put to the hazard of two juries, each believing the absent tortfeasor the wrongdoer." 29 N. W. 2d at 871, 872, 874. "The fact that the parties defendant are antagonistic or that the railroad foresees difficulties in drawing a jury are immaterial. See Driefus v. Levy, La. App., 140 So. 259, 261. In this last cited case where it was held the trial court committed no error in refusing severance where a guest in one colliding car sued both drivers, the court stated: '*Invariably, as in this case, where joint tortfeasors are joined in the same suit, their defenses are antagonistic, for each attempts to place the blame on the other.*'" 29 N. W. 2d at 873 (emphasis added).

We could dispose of this contention by simply saying the so-called loan receipt agreement was only before the trial court when it considered the matter of separate trials and there was no abuse of discretion in resolving this controversy in one trial. We could also fault Dehner for not citing a single case supporting its desire for a separate trial. Either of these would be a sufficient basis for our decision. However, the record here is repleat with cross-contentions regarding the validity of this loan receipt agreement. So we add to this a

discussion of legal validity of this type agreement on the merits.

A loan receipt agreement has been recognized as a legitimate device under Indiana law. An insurance company may enter into a loan receipt agreement with a third party who has been injured by the alleged negligence of its insured. In *Klukas* v. *Yount,* 121 Ind. App. 160, 164, 98 N. E. 2d 227, 229 (1951), this court stated:

> "The question in this case is whether an insurance carrier may lend anyone who has suffered injury through the negligence of its insured an amount sufficient to cover his loss under an agreement that he will institute suit in his own name against the one causing the loss, or against another insurance carrier, and that he will be obligated to repay the loan only to the extent of his recovery in the suit; and whether such a transaction amounts to absolute payment or has the effect of satisfying such person's loss. Counsel states that there are no cases on this question in this state and we have found none but there are innumerable foreign cases covering this question. (Citations omitted)
>
> These authorities point out that it is the intention of the parties to the transaction which determines whether or not it is a loan or an absolute payment.
>
> Under the authorities just cited, the loan did not amount to a payment of the loss nor did the lender State Farm Mutual Automobile Insurance Company, become subrogated to the claim of the appellee against appellant so as to require the action to be brought in its name."

*Klukas* v. *Yount, supra,* has been cited with approval in *Bolton* v. *Ziegler,* 111 F. Supp. 516 (N.D. Iowa 1953) ; *Gould* v. *Weibel* (Fla.), 62 So. 2d 47 (1952), and *Crocker* v. *New England Power Co.,* 348 Mass. 159, 202 N. E. 2d 793 (1964) ; *Western Spring Service Co.* v. *Andrew,* 229 F. 2d 413 (10th Cir. 1956). See also, *State Farm Mut. Auto Ins. Co.* v. *Hall,* 292 Ky. 22, 165 S. W. 2d 838 (1942) ; *Bland* v. *Espland,* 231 Minn. 444, 43 N. W. 2d 274 (1950) ; *Wilson* v. *Anderson,* 113 Colo. 396, 157 P. 2d 690 (1945) ; and *Klotz* v. *Lee,* 36 N. J. Super. 6, 114 A. 2d 746 (1955).

*Barker* v. *Sumney,* 185 F. Supp. 298, 300 (N.D. Ind. 1960), was an action by a driver of a farm tractor for personal injuries sustained in a collision between two vehicles. Prior to filing suit the plaintiff entered into a covenant not to sue as to one potential defendant. The covenant provided in part:

"Whereas thereafter and on the 2nd day of January, 1959, the said William Barker filed an action for damages against the said Charles William Sumney in the United States District Court for the Northern District of Indiana, South Bend Division, and therein alleged and averred that the said Charles William Sumney at the time of said collision was the agent, servant and employee of said Steinman, Inc., Steinman Trucking, Inc., or Orville Steinman, and said Pennsylvania, Indiana and Illinois Motor Express, Inc., and

"Whereas Markel Service, Incorporated and American Fidelity and Casualty Company had issued a policy of insurance to said Steinman, Inc., Steinman Trucking, Inc., and Orville Steinman, covering the said tractor and trailer, which tractor the said Charles William Sumney was driving at the time of the accident aforesaid, and

"Whereas Michigan Surety Company, of Lansing, Michigan, had issued a policy of insurance to said Pennsylvania, Indiana and Illinois Motor Express, Inc., which policy was numbered C A 72678, and

\* \* \* \* \*

"Whereas the undersigned William Barker and the said Michigan Surety Company and Pennsylvania, Indiana and Illinois Motor Express, Inc., desire to set at rest the differences between them in the premises without in any manner prejudicing the right of said William Barker to proceed against the said Steinman, Inc., Steinman Trucking, Inc., or Orville Steinman, Market Service, Incorporated and American Fidelity and Casualty Company, and

"Whereas the said William Barker has demanded and now demands a sum greatly in excess of that hereinafter mentioned as being paid by the said Michigan Surety Company and Pennsylvania, Indiana and Illinois Motor Express, Inc., to said William Barker \* \* \*."

Referring to the above quoted agreement in *Barker* v. *Sumney, supra,* in ruling on a Motion for Summary Judgment. Judge Grant stated:

"Notwithstanding this Court's belief that an unsatisfied execution need not be returned before execution may be had against the defendant tortfeasor's insurer, defendant's argument wholly fails to take cognizance of the fact that in the covenant the plaintiff reserved the right to sue the defendant and that this suit is within the meaning and intent of the covenant. Notwithstanding the title given the Covenant by the parties, this Court is convinced that, insofar as it relates to the precise question, here presented, what is before it is a 'Covenant Not to Execute' on any possible judgment obtained against the named defendant Charles William Sumney. No necessity exists to warrant a discussion of the legal effect of such covenants. See *Ivy* v. *Pacific Automobile Ins. Co.*, 1958, 156 Cal. App. 2d 652, 320 P. 2d 140, for a discussion in this regard."

In *Klotz* v. *Lee, supra,* there was an agreement during the pendency of the action between the plaintiff and one defendant and his insurer in which it was agreed that if the jury returned a verdict, the insurer would pay plaintiff a certain sum in full satisfaction, subject to the condition, if verdict was against all defendants the plaintiff would not exact more than one-half of the verdict from said defendant or his insurer. This was a valid agreement. The agreement was revealed to the trial judge and counsel for all parties as soon as it was executed. The court also concluded that such agreement should not be disclosed to the jury.

Recently, in *Edwards* v. *Passarelli Bros. Automobile Service, Inc.,* 8 Ohio St. 2d 6, 221 N. E. 2d 708 (1966), the court held that evidence of advance payments was not admissible at trial.

In *Edwards* v. *Passarelli Bros. Automobile Service, Inc., supra,* the so-called advance payment technique was judicially approved by the Supreme Court of Ohio. This principle has been recognized in other jurisdictions. For example, the Supreme Judicial Court of Massachusetts stated in *Crocker* v. *New England Power Co.,* 348 Mass. 159, 202 N. E. 2d 793:

"* * * The result * * * is desirable. The injured plaintiff, who is allowed funds while his claim is litigated is saved from becoming a victim of the law's delays. We are not disturbed by the argument that a loan receipt agree-

ment is a device to evade the rule that there can be no contribution among tortfeasors." *Crocker* v. *New England Power Company* (1964), 348 Mass. 159, 202 N. E. 2d 793, 795.

The leading case in this area was decided by the Supreme Court of the United States, *Luckenbach* v. *McCann Sugar Ref. Co.*, 248 U. S. 139 (1918), which has often been cited. See also, *Waumbec Wills, Inc.* v. *Bahnson Service Co.*, 103 N. H. 461, 174 A. 2d 839 (1961) ; *Western Spring Service Company* v. *Andrew*, 229 F. 2d 413 (10th Cir. 1956).

It is elementary the Appellee-Plaintiff could have chosen to sue only one of the two defendants. She could also have been chosen to levy execution on a judgment against either tortfeasor and received full satisfaction thereof against either provided she received only one full satisfaction. She could have received part satisfaction from one tortfeasor in consideration for a covenant not to execute and proceeded for the balance of the judgment against the remaining tortfeasor. Likewise, she could have executed a covenant not to sue as to one potential joint tortfeasor and proceeded against the other. *Black* v. *Marsh*, 31 Ind. App. 53, 67 N. E. 201 (1903) ; *Parry Mfg. Co.* v. *Crull*, 56 Ind. App. 77, 101 N. E. 756 (1913) ; *Bedwell* v. *DeBolt*, 221 Ind. 600, 50 N. E. 2d 875 (1943) ; *Cleveland C. C. and St. L. Ry. Co.* v. *Gossett*, 172 Ind. 525, 87 N. E. 723 (1909).

Therefore, in the so-called loan receipt agreement all of these options were open to the Plaintiff-Appellee. The loan receipt agreement in question does not conflict with any of these rules but represents a permissible innovation in them by the Plaintiff-Appellee. The fact that this loan receipt agreement was openly entered into before the trial does not affect its validity.

As manifested by the Ohio Supreme Court in *Edwards* v. *Passarelli Bros., supra,* there are good policy reasons to support the advance payment concept, not the least of which is the plain economic need of a severly injured person and the

delays in our court system. The railroads used this technique in FELA cases 30 years ago. See *Detroit, Toledo and Ironton Railroad* v. *Pitzer*, 42 Ohio Law Abs. 494, 61 N. E. 2d 93 (1943). The concept of advance payments is receiving widespread acceptance by the bar and the liability insurance industry. See 1967 American Bar Association Section of Insurance, Negligence and Compensation Law Proceedings, page 499 *et seq.*

Although the case at hand involves more than the advance payment concept, that principle is involved to the extent that the loan receipt agreement put into the plaintiff's hands much needed funds at a critical time while the litigation of her case proceeded.

The use of loan receipt agreements have also been recognized in claims under the Indiana Workmen's Compensation Act. See *Weis* v. *Wakefield*, 111 Ind. App. 106, 38 N. E. 2d 303 (1941). See also *Snyder* v. *Miller*, 216 Ind. 143, 22 N. E. 2d 985 (1939).

These authorities from Indiana and other jurisdictions certainly provide for the use of a loan receipt agreement and use of the same is neither contribution among joint tortfeasors or an assignment of a cause of action sounding in tort. See cases collected in 1 A.L.R. 1528, 132 A.L.R. 607 and 157 A.L.R. 1261.

Appellant Dehner relies heavily on twin cases decided by the Supreme Court of Wisconsin; *Trampe* v. *Wisconsin Telephone Co.*, 214 Wis. 210, 252 N. W. 675 (1934), and 214 Wis. 218, 252 N. W. 678 (1934). There are two immediate contrasts between that case and this. First, the agreement was kept a secret which was not the case here. This point was repeatedly emphasized in the opinion. Second, the law of Wisconsin differs from Indiana on contribution of joint tortfeasors. In *Trampe* the Wisconsin Supreme Court condemned the settlement between the plaintiff and one of two joint tortfeasors because it placed a disproportionate share of the

burden on the other wrongdoer and thus defeated the policy of contribution followed in Wisconsin (but not in Indiana). Appellant Dehner apparently argues that *Trampe* which held the agreement invalid in Wisconsin for defeating, is authority here for a similar agreement which, it contends, promotes contribution. *Trampe* is not authority here either for its reasoning or result.

In *Pellett* v. *Sonotone Corp.*, 26 Cal. 2d 705, 160 P. 2d 783 (1945), the plaintiff entered into an agreement with one joint tortfeasor under which he received $5.00 and was to receive $10.00 if he secured judgment. He agreed not to levy execution as to this particular joint tortfeasor. The Supreme Court of California stated:

> "* * * since the plaintiff did not expressly or by necessary implication abandon or relinquish his claim or right of action, or agree to accept the payments in satisfaction of his claims, and since the agreement according to its terms could not be pleaded by the covenantee as a defense to the action, and since the only agreement by plaintiff was that he would not levy execution on any property of the covenantee or make demand upon him for payment of the judgment or any portion thereof, we are of the opinion that it is closely akin to a covenant not to sue, that its legal effect should be held to be similar, and that it is not such an instrument as will operate to release other joint tort feasors." 160 P. 2d at 787.

This same result was reached in a similar case in *Farrell* v. *Kingshighway Bridge Co.*, Mo. App., 117 S. W. 2d 693 (1938), and in *Gillette Motor Transport Co.* v. *Whitfield*, Tex. Civ. App., 186 S. W. 2d 90 (1945).

In various forms throughout the record in this case, Dehner complains of the antagonism which existed between it and NIPSCO. This is attributed to the so-called loan receipt agreement. However, even a cursory examination of the defenses filed by NIPSCO and Dehner would readily indicate that from the earliest stages of this case they were engaged in an extensive effort to blame each other. Such

conduct is not foreign to litigation defended by more than one party. There is no legal requirement that co-defendants must be friendly in defending a lawsuit. The realities of litigation clearly indicate that co-defendants are frequently unfriendly.

Unquestionably the Plaintiff-Appellee Otis could have given the Appellant NIPSCO a covenant not to sue in consideration for $50,000.00 and proceeded against Dehner. She could have given a covenant not to execute against NIPSCO *after* trial. She could have given a covenant not to sue or execute against NIPSCO before trial. She could have accepted a so-called advance payment from NIPSCO before trial.

Admittedly the arrangement between Otis and NIPSCO represents a blend of the above rules. It is, however, a legally permissible blending of them which is not contrary to public policy.

### *PROPOSITION II*

Dehner argues that the damages are excessive. To consider this point it is necessary for us to summarize, with all inferences most favorable to appellee, from extensive testimony related to damages. The plaintiff, Regina Otis, was a housewife and the mother of 14 children, 12 of whom lived at home on the date of the explosion. She was 38 years of age. On the United States Life Tables a white female, age 38, has a life expectancy of 38.2 years. An explosion occurred in the front yard of a friend across the street whereupon the plaintiff went to the house of the friend and was helping her remove her pets from her house. The neighbor opened a cellar door. It was like an inferno. Plaintiff was blown across the room. The neighbor lady was burned up. Plaintiff was blown against a wall 8 feet away; her coat was burned off her, her other clothing burned, and her hair was on fire. The entire house was aflame and plaintiff attempted to get out by opening a window. Plaintiff got out and saw her neighbor still burning in the driveway. Plaintiff extinguished the flames of

her clothes in the snow. She attempted to run home but the police took her to the hospital. At the hospital Dr. Gentile cut off the remainder of her clothes which was the last she remembered for some time. She was in the constant care unit and was in extreme pain. She stayed in the hospital 59 days. She was catheterized and treated by three doctors, Doctors Gentile, Clark and Brucker. In the hospital they attempted egg yolk and silver nitrate treatments, neither of which the plaintiff could tolerate because of pain. They performed a surgical procedure called debridement upon burns which resulted in terrific pain. They grafted 64 square inches of skin. Her feet were scarred and plaintiff cannot wear stockings which cause a tingling sensation. She has scars on neck and face. When she gets nervous or tense it feels as if a million ants are crawling on her. She feels as if people are staring at her constantly. She hates to be alone. She sleeps fitfully. She has bad dreams of the fire, sometimes two or three times per week. The problem with dreams does not improve. She still lives at the same house and there is still a hole where the neighbor's home is which only serves to remind her of the fire. She has experienced personality changes, she overreacts to any loud noise, she doesn't like to leave her children alone for fear of another tragedy. She isn't as interested in home and family as she was before. She suffers depression. She has seen a psychiatrist, which is expensive.

There was testimony that before the explosion plaintiff was a happy-go-lucky person who took things in stride. Since the explosion she seems on the verge of a nervous breakdown.

Dr. Brucker, a plastic surgeon, testified plaintiff had second and third degree burns. He performed the skin graft on about 64 square inches of plaintiff's body. He also performed a debridement which is surgical cleaning of the wound. A skin graft will never withstand wear and tear tolerated by normal skin. Grafts are initially tender and sore. Grafted skin will not heal as well as normal skin. Infection is harder to treat in grafted skin. Sensation in grafted skin is diminished because

nerve regeneration is not good. It takes the donor area (the area from which the skin used in the graft) about 14 days to heal. Most people complain more about the donor area than where the skin is applied. Blood supply is diminished and elasticity is also diminished. There is some contraction or tightening of the scar. The scar area is more vulnerable to trauma. Scar tissue usualy develops.

Dr. Gentile testified at the time plaintiff entered the hospital she was experiencing difficulty breathing because of the burns to her face. She had inhaled fumes from the fires. At that time he estimated 45 to 50% of plaintiff's body had sustained second or third degree burns. She experienced excruciating pain which necessitated large amounts of narcotics, analgesics and pain medication. She was given intravenous fluids and whole blood to maintain body's electrolytes. He doesn't think she will ever be able to erase the experience from her mind; she will probably live with it the rest of her life. The scars are permanent and nerve endings were destroyed. Dr. Gentile suggested plaintiff see Dr. Main, a psychiatrist. Dr. Gentile found it difficult to make a prognosis for plaintiff because most people who are burned as badly as she, die. Therefore, the doctors do not have a vast amount of medical knowledge for comparison. The healing of her scar areas will probably contract and worsen as she gets older.

In third degree burns the skin is cauterized or charred. She was in constant pain in the hospital. Twelve pages of the hospital chart disclose the drugs, narcotics, intravenous fluids and blood received by plaintiff.

This verdict must be considered in terms of the statement of this court in *Kavanagh* v. *Butorac*, 140 Ind. App. 139, 221 N. E. 2d 824, 828 (1967):

> "By nature, injuries personal to the individual, are incapable of a more definite rule for measurement of damages. Each action is unique and it must be so treated and determined on the facts peculiar to that matter. Because

our law seeks to individualize the solution to the problem of properly compensating the victim of torts, no overall expedient applies to every case.

"For a formula then, our common law sets only the general guidelines for compensating the victim, each in its own way to be considered by the trier of facts and weighed to determine what the total compensation will be. Because of this personal nature of each case and since the decision is unique to the particular set of facts our courts have said the trier of facts is to be given 'sound discretion,' and 'liberal discretion' where damages cannot be defined and calculated with mathematical certainty or by any exact standard. (citing cases)

"With the foregoing in mind we have examined the record and briefs in this appeal. Appellant has documented numerous cases to show that the instant judgment far exceeds what as he says 'in Indiana or elsewhere' has been allowed for what he submits to be 'comparable injury.' We are not able to say the loss of an eye in one case is worth the same or just about the same in another case. If such a system is to be desired (and we express no sentiment for such idea) it must come from legislation. Our common law requires each case to rest finally on its own merits.

"This has been well expressed by many authorities and we call attention to the language of the Supreme Court of Louisiana:

'* * * [C]ases relied upon may be similar in that each of them involves a similar injury such as a broken arm, the loss of an eye or eyes, or the loss of some member of the body. Thereafter, however, the similarity ceases for each case is different, and the adequacy or inadequacy of the award should be determined by the facts and circumstances peculiar to the case under consideration. The primary purpose of the judge or the jury in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case.' (citing case)

"We would have it understood that the duty devolves on a trial court to determine the amount of damages. Whether the court is assisted by a jury or not, review on the appellate level should be the same. The determination of the amount is not our decision. We are not required to say what our decision might have been if we were the trier of the facts."

We cannot say as a matter of law that the damages assessed were so grossly and outrageously excessive as to induce the belief that they were the result of prejudice, partiality or corruption as defined in *Kampo Transit, Inc.* v. *Powers,* 138 Ind. App. 141, 211 N. E. 2d 781 (1965).

The only Indiana cases cited by the Appellant Dehner on the question of excessiveness were *Kampo Transit, supra,* and *Continental Optical Co.* v. *Reed,* 119 Ind. App. 643, 86 N. E. 2d 306 (1949). *Kampo* involved a $55,000.00 verdict for a broken neck which verdict was affirmed and is in no way authority for Dehner here. *Continental Optical* involved a $20,000.00 verdict for invasion of privacy which is factually irrelevant to this case.

In addition to the *Kampo* and *Kavanagh* v. *Butorac* cases this court has recently affirmed a number of cases involving substantial awards for personal injuries. In *Clemans Truck Lines, Inc.* v. *Vaughn,* 139 Ind. App. 404, 220 N. E. 2d 351 (1966), a verdict of $90,000.00 was involved for loss of an arm above the elbow. In *Hollowell* v. *Greenfield,* 142 Ind. App. 344, 216 N. E. 2d 537 (1966), we affirmed a $55,000.00 verdict for the loss of four fingers of an 11 year old child. In *Indianapolis Transit, Inc.* v. *Moorman,* 134 Ind. App. 572, 189 N. E. 2d 111 (1963), this court stated:

> "On the question of excessive damages in order to justify a reversal 'on such ground, the amount of damages assessed must appear to be so outrageous as to impress the court at "first blush" with its enormity.' *New York Cent. R. R. Co.* v. *Johnson, Admx., etc.* (1955), 234 Ind. 457, 127 N. E. 2d 603; *Louisville, etc. R. Co.* v. *Kemper* (1899), 153 Ind. 618, 53 N. E. 931; *Hines, Director,* v. *Nichols, Admr.* (1921), 76 Ind. App. 445, 453, 130 N. E. 140.
>
> "We, as apparently was the jury, are aware of the general inflation and the constant depreciation and cheapening of money. *New York Cent. R. R. Co.* v. *Johnson, Admx., etc., supra; Hahn et al.* v. *Moore* (1956), 127 Ind. App. 149, 133 N. E. 2d 900, 134 N. E. 2d 705.
>
> * * * '*It must also be remembered that the trial judge was in a position to determine whether there was passion*

*and prejudice existent, such as would unduly influence the jury in assessing damages when he passed on the motion for new trial.'* " (our emphasis)

It is a matter of common knowledge that burns are the most severe and painful of all personal injuries. The extensive pain associated with severe burns is one of the primary reasons that burn cases result in among the highest awards for personal injuries. See *Hulke* v. *International Mfg. Co.*, 14 Ill. App. 2d 5, 142 N. E. 2d 717 (1957); *Holfester* v. *Long Island R. Co.*, 360 F. 2d 369 (2d Cir. 1966); *Larsen* v. *Minneapolis Gas Company* (Minn.), 163 N. W. 2d 755 (1968); *Pan American Petroleum Corp.* v. *Like* (Wyo.), 381 P. 2d 70 (1963); *American National Bank and Trust Co.* v. *Peoples Gas and Coke Co.*, 42 Ill. App. 2d 163, 191 N. E. 2d 628 (1963), and *Wytupeck* v. *Camden*, 25 N. J. 450, 136 A. 2d 887 (1957).

Recently, in *Allison* v. *Boles*, 141 Ind. App. 592, 230 N. E. 2d 784 (1967), quoted with approval was an excellent statement of the applicable rule by Chancellor Kent in *Coleman* v. *Southwick*, 9 Johns, N. Y. 45, 6 Am. Dec. 253, 254 (1812):

> "The rule is well established in this state that where the reasonable amount of recovery is in dispute under the evidence, the amount awarded cannot be considered excessive if it is within the scope of the evidence before the Court. *First Bank & Trust Company of South Bend, Executor of Estate of Spiro* v. *Tellson* (1954), 124 Ind. App. 478, 484, 118 N. E. 2d 496.
>
> "The amount of the judgment in this case does not seem to be excessive, when we recognize that the trial court was aware, as is this court, of the current inflated economy and the depreciated value of the dollar. The general rule of law applicable which has been the one recognized for over a hundred years, is to be found in the case of *Coleman* v. *Southwick* (1812), 9 Johns, N. Y. 45, 6 Am. Dec. 253, 254, wherein Chancellor Kent stated:
>
> 'It is not enough to say, that in the opinion of the court, the damages are too high and that we would have given much less. It is the judgment of the jury, and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries * * * The damages, therefore, must be so excessive as to strike mankind, at first

blush, as being beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line, for they have not standards by which to ascertain the excess.' "

The rules which we apply here are indeed very old wine.

The only evidence on the question of damages was produced by the Appellee and neither Appellant offered any evidence in this respect. Thus the Appellee's evidence on damages stands before the court uncontested. *City of Indianapolis et al.* v. *Walker et al.*, 132 Ind. App. 283, 168 N. E. 2d 228 (1961).

### PROPOSITION III

Dehner complains of the court's refusal to give its tendered instruction number 10, which stated:

"If you find in favor of the plaintiff you are instructed that you may not include, in your consideration of damage, any of the following:

Expenses incurred or to be incurred in the future by the plaintiff's husband, nor

The value of plaintiff's services either in connection with the management of the house or otherwise, nor,

Any loss of companionship to plaintiff's husband or family, nor may you add any amount for the purpose of punishing either party or to make an example of them, or to prevent further accidents."

It is the law of Indiana that unless it was the duty of the trial court to give the instruction precisely as requested, there is no error in its refusal. *Carbon* v. *Johnson*, 141 Ind. App. 369, 228 N. E. 2d 52 (1967).

There is no reversible error in refusing to give instruction as to elements not within the issues even though they state an abstract proposition of law correctly. *Coleman* v. *Chapman*, 139 Ind. App. 385, 220 N. E. 2d 285 (1966).

The court did give Appellee's instruction 12, which stated:

"If upon a fair preponderance of the evidence, the instructions of the Court and the argument of counsel, you find that the plaintiff is entitled to recover from the defendants, or either of them, you will assess the damages, for personal injuries, if any, suffered by the plaintiff, Regina Otis, in an amount adequate to fairly compensate her for any personal injuries which she may have suffered.

It is not necessary for the plaintiff to prove dollar values of any bodily injuries which she may have suffered. It is sufficient if she has proved the bodily injuries and then it is your duty to assess an amount in money which in your judgment will be a fair and adequate compensation therefor. I instruct you that if you find that Regina Otis is entitled to recover in this action your verdict should award her fair and adequate compensation for any and all of the following items of damage if they have been proved by a fair preponderance of the evidence and proximately resulted from the negligence of the defendant or defendants:

1. Physical pain and suffering which she may have suffered in the past or which she may reasonably be expected to suffer in the future as a result of this occurrence.

2. Any disability of bodily function which she may have suffered since the occurrence or which she may suffer in the future as a result of this occurrence.

3. Any disfigurement which may have resulted to plaintiff because of the occurrence and in this connection you may consider whether any permanent disfigurement or physical effects have resulted therefrom and, if so, include compensation for any such permanent disfigurement in your verdict.

4. Any mental suffering which the plaintiff has suffered or will suffer in the future as a result of this occurrence. By mental suffering, I mean any anxiety, mental anguish and distress of mind as distinguished from physical pain or physical pain or suffering.

In determining the amount of damages, if any, to which plaintiff would be entitled, as flowing proximately from the accident complained of, it is your duty to take into consideration her age, and her condition in life, the physical pain and mental anguish, if any, which she suffered, the question of whether the injuries with which she is afflicted are temporary or permanent, any disfigurement, as the result of the accident; and, in short, award her such an amount,

if she is entitled to recover, as will reasonably and fairly compensate her for the injuries and damages, if any, which she has sustained.

If you find for the plaintiff, your verdict may be for no more or no less than fair and adequate compensation for the items of damage which I have outlined, provided that they have been proven by a fair preponderance of the evidence, and provided that you find from the evidence and in conformity with all of the instructions that plaintiff is entitled to recover in this action, and not in excess of Two Hundred Thirty-Five Thousand Dollars ($235,000.00)."

The instruction given was within the pleadings and a correct statement of the applicable Indiana law. See *Columbia Grocery Co. v. Schlesinger,* 102 Ind. App. 617, 200 N. E. 414 (1936).

It is also obvious the trial court in instruction number 12 specifically limited the award to the evidence introduced at trial. In *Cleveland, C. C. and St. L. Ry. Co. v. Clark,* 51 Ind. App. 392, 97 N. E. 822, this court stated:

"[I]t will be observed that the instruction expressly limits the jury in assessing damages to the consideration of evidence relating to the subject of damages. It will be presumed that the jury obeyed this instruction, and that in fixing the amount of damages, it considered only the evidence having a legal relation to that subject." p. 417.

Plaintiff's instruction 12 stated in substance the language adopted in Indiana Pattern Jury Instructions, Chapter 9, § 9.01. We find no error in refusing Dehner's tendered instruction number 10.

*PROPOSITION IV*

Dehner claims error in the admission, over objection, of plaintiff's Exhibit 16 which was a piece of 12 inch pipe removed from the same gas line. There was evidence that the section of main from which Exhibit 16 was taken was installed by Dehner under the same contract and at the same time when Dehner installed the gas line where the explosion

occurred. The welder who worked for Dehner at the time the gas line in question was installed testified that he did all the welding on the section line in question. The line in question was from the Hale Avenue Plant to the intersection of Old Mill and Lexington. The explosion occurred between those two points. Dehner's welder did all the welding between those two points. The welder testified he used the same skill in making all the welds. There was an abundance of testimony from which the jury could have found this explosion was caused by a defective weld between those two points. There was also evidence that plaintiff's Exhibit 16 was another defective weld, done by the same welder working for the same contractor, i.e. Dehner, at the same time and under the same contract. Dehner offered expert testimony relating to tests of other welds on both sides of the explosion. In fact, Dehner's counsel asked his own expert witness at trial:

"Q. Again in your opinion it is your testimony because of the remarkable similarity of the welds to the north and south of this particular weld which you tested (Plaintiff's Exhibit 15,) it is your opinion I take it that those welds are similar?
"A. Yes."

When plaintiff's Exhibit 16 was offered her counsel made the following offer:

"Now, Your Honor, with the same limitation and for the same purpose, not for the purpose of showing that Plaintiff's Exhibit No. 16 was the weld that broke in the explosion or that it in any way contributed to the explosion but merely for the limited purpose of showing the type of work that went into the welding of the entire line, the plaintiff now offers Plaintiff's Exhibit No. 16."

Mr. Charles Tennant, a welder employed by NIPSCO testified Exhibit 16 came from a part of the line laid by Dehner under the contract with NIPSCO here in question.

*Logansport & Wabash Valley Gas Co.* v. *Coate,* 29 Ind. App. 299, 64 N. E. 38 (1902), was an action resulting from

a gas explosion. The plaintiff introduced evidence of other leaks before the explosion from other places in the pipe system. This court stated at page 304:

"The evidence now under consideration was not irrelevant. It tended to show the condition of the system in dispute."

In *Farm Bureau Mut. Ins. Co. of Ind.* v. *Seal,* 134 Ind. App. 269, 179 N. E. 2d 760 (1962), this court held that the admission of similar transactions as evidence that a particular thing was done is within the discretion of the trial court. Unless there has been an abuse of discretion this court will not reverse on that point alone. See also, *Alexandria Mining and Exploring Co.* v. *Irish,* 16 Ind. App. 534, 44 N. E. 680 (1896), and *Chicago, St. L. & P. R. Co.* v. *Spilker,* 134 Ind. 380, 33 N. E. 280 (1893).

The Appellant Dehner offered evidence relating to other welds on the same line and therefore the subject was properly pursued by all the parties to this case.

There was no reversible error in the admission of Exhibit 16.

### PROPOSITION V

Next, Dehner complains of the admission, over objection, of defendant's NIPSCO's Exhibit 21, which was a contract dated July 16, 1951:

"Short Form Agreement

Fort Wayne, Ind.

This agreement, made and entered into this 16th day of July, 1951, by and between the Northern Indiana Public Service Company, an Indiana corporation, party of the first part (hereinafter called the 'Company') and John Dehner, Inc. Contractors of 1206 Clark Street Fort Wayne Indiana, party of the second part (hereinafter called the 'Contractor'), WITNESSETH:

That for and in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

(1) The Contractor covenants and agrees as follows:

To furnish all labor, tools, and equipment necessary to construct and install gas mains and/or services under supervision of the Gas Company's Engineer or Inspector, in accordance with the terms and conditions of the attached Contract and Specifications.

(2) That all materials furnished hereunder shall be the very best of the respective kinds and the said work shall be done in a first class workmanlike manner and to the satisfaction of the Company.

(3) To guarantee and pay to each and every one of the employees of the Contract, and to the dependents of such employees, engaged or employed upon or in and about the work done by said Contractor under this agreement, compensation provided for in and by any Workmen's Compensation Laws, Workmen's Occupational Diseases Acts or Employer's Liability Acts applicable; and to insure and keep insured his liability to pay Compensation under such Workmen's Compensation Laws, Workmen's Occupational Diseases Acts or Employer's Liability Acts in some company or association authorized to insure liability to pay compensation under said laws and to deliver a certified copy or copies of said insurance policy to the Company upon request.

(4) The contractor shall obtain, and keep in force during the term of this contract, and the performance of the work hereunder, a certificate from the Industrial Board of the State of Indiana showing that the contractor has complied with Sections 5, 68 and 69 of the Indiana Workmen's Compensation Act and paragraphs (a), (b) and (c) of Section 27 of The Indiana Workmen's Occupational Diseases Act, and shall forthwith deliver to the Owner copies of said certificates. Said Contractor shall pay all compensation, physician's fees, hospital fees, nurses' charges, and burial expenses on account of the injury or death of any employee of such Contractor, arising out of and/or in the course of the performance of the work covered by this contract as required by The Indiana Workmen's Compensation Act, The Indiana Workmen's Occupational Diseases Act, or any Workmen's Compensation Act, Workmen's Occupational Diseases Act, or Employer's Liability Law applicable, and shall indemnify and save harmless the Owner from any and all liability to pay the same.

(5) To defendant any and all suits brought against the Company by any employee or other person (whether employed by Contractor or not) for damages alleged or

claimed to have been caused by or through the work done by the Contractor under this agreement, and to indemnify and save harmless the Company from and against all claim or claims arising out of the work done by the Contractor; also to pay, liquidate and discharge any and all claims or demands for injury, loss or damage to any and all persons or property caused by, growing out of, or incidental to the work done by the Contractor under this agreement, including all claims for damages for the obstruction to private driveways, streets and alleys, and including all costs of suits and reasonable attorney's fees. In the event of any accident or claim the Contractor shall give immediate notice to the Company. The Contractor further agrees to take out and maintain indemnifying insurance satisfactory to the Company, the policy or certified copy or copies thereof to be delivered to the Company upon request.

(6) To start upon said work on the 23rd day of July, 1951, and to complete same on or before the ——— day of ————————————, 19——.

(7) The Company covenants and agrees to pay the Contractor for all of said work materials and labor, upon receipt of an itemized invoice in accordance with the attached contract Dollars ($———) as follows: Upon completion of the work and the furnishing to the Company of satisfactory evidence that the same is free and clear of all mechanic's and other liens and the possibility thereof.

(8) This agreement shall not be binding upon the Company until the approval of the President or a Vice President of the Company is written hereon and attested by the Secretary or an Assistant Secretary.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

Dehner objected:

"The defendant John Dehner objects to the introduction of the defendant's Exhibit No. 21 and moves with regard thereto that paragraphs 3, 4, and 5 of the Short Form Agreement.

We move with regard to each of these paragraphs and portions of paragraphs separately that they be excluded for the reason, first of all, each of them is prejudicial by the references to indemnity and insurance to this defendant, John Dehner, Inc.; that each of the paragraphs is imma-

terial to the issues in this case filed by Mrs. Otis and is not embraced by the pleadings filed by any of the parties or raised by any of those pleadings, and is not relevant to the duties owing to the plaintiff or owing in the course of the execution of the work under the agreements.

Now separately we object to the letter which is found at the first page of the Exhibit No. 21, dated July 13, 1951, material to the question of negligence and the allegations of the plaintiff's complaint, and that the letter predates the contract and the contract embodies the agreement of the parties and that the letter is merged in the terms of the contract."

If Exhibit 21 was relevant to the issues in the case it was properly admitted. By its amended answer Dehner sought to be relieved of any liability on the ground its employees were furnished to NIPSCO and that Dehner was not responsible for the adequacy of procedures specified by NIPSCO; it also contended NIPSCO had full responsibility. The contract between NIPSCO and Dehner was highly relevant to these precise issues raised by Dehner.

The reference to insurance in the contract does not of itself render the contract inadmissible. In *Pickett* v. *Kolb,* 250 Ind. 449, 237 N. E. 2d 105 (1968), our Supreme Court stated:

"It necessarily follows that proof of insurance if necessary to establish either a cause of action or defense under the issues, is competent and may be shown. * * * 'In other words, proof of liability insurance in and of itself is not admissible but such a principle may not be expanded to the extent that it serves as a means of excluding otherwise competent evidence which is relevant to the issues involved in the trial. We do not think that a trial court may arbitrarily exclude otherwise competent and relevant evidence merely on the ground that it will reveal an insurance carrier is involved." page 108.

See also, *City of Terre Haute* v. *Deckard,* 243 Ind. 289, 183 N. E. 2d 815 (1962); *Rust* v. *Watson,* 141 Ind. App. 59, 215 N. E. 2d 42 (1966); *Van Drake* v. *Thomas,* 110 Ind. App. 586, 38 N. E. 2d 878 (1942); and 4 A.L.R. 2d p. 784.

*PROPOSITION VI*

Dehner claims error in overruling its Motion for Mistrial in regard to admission of defendant NIPSCO's Exhibit 28. The Court gave the following cautionary instruction:

"You are instructed that you are to consider any references in this contract to insurance and indemnity only as the agreement to carry insurance and any agreement to indemnify another party may or may not relate to the relationship between the defendants, John Dehner, Inc., and Northern Indiana Public Service Company. You are not to consider such references for any other purpose. In regard to the complaint filed by Mrs. Otis against the defendants, whether a party did or did not carry insurance or did or did not indemnify the other has absolutely no bearing or relevancy on the claim filed by Mrs. Otis. You are only to consider such references in the contract as they may or may not relate to the relationship between the defendants."

Dehner then moved for mistrial which the trial court overruled. This point has been adequately considered in our discussion of Proposition V. In addition we believe the court's cautionary instruction was adequate. See *Pumphrey* v. *Tannehill,* 104 Ind. App. 468, 8 N. E. 2d 414 (1937); *Gerking* v. *Johnson,* 220 Ind. 501, 44 N. E. 2d 90 (1942); and *Home Telephone Co.* v. *Weir,* 53 Ind. App. 466, 101 N. E. 1020 (1913).

*PROPOSITION VII*

Dehner next suggests error in overruling objections made by Dehner to questions to two of Dehner's expert witnesses, Harris A. Goodwin II and Edward C. McLean on cross-examination by NIPSCO. The pertinent testimony of the witness Goodwin is as follows:

"Q. Were you here when Professor Singer testified that if a man told him under oath that that section of pipe, which is the one at Broadway and Kinsmoor, was buried with a protective coating on it he wouldn't believe him?

MR. KRUECKEBERG: If the court please, this is the objection similar to the one this morning and we object to it because it assumes facts not in evidence.

MR. McNAGNY: We'll leave that to the jury. I have asked the reporter to type up the cross-examination of Professor Singer, and if I am wrong, I will stand corrected. I am simply asking this witness if that was testified to whether he would agree with it or not.

THE COURT: Overruled. Let him answer if he knows.

A. Is this a hypothetical question?

Q. If you like.

A. Which way do you want me to answer it if it is a hypothetical question?

Q. Why don't you let me ask the question, sir? My question is this. Would you agree with an expert who examined that pipe, a man who is a professor at the University of Illinois, and said he wouldn't believe testimony under oath from the foreman that that was buried with a tape coating on it? Would you agree or not agree with that statement?

A. Did he say that?

MR. KRUECKEBERG: This other objection this morning, I think that was attributed to Mr. Snyder.

MR. McNAGY: That is my mistake and I mean Professor Singer. As I say, I am having his testimony typed up, which I invite you to do also, and we can save that for argument with the jury if I am mistaken.

THE COURT: Overruled. Let him answer if he knows.

A. I will answer it.

THE COURT: All right, sir.

A. I don't know what Professor Singer knows about dry cleaning.

Q. Mr. Witness, would you please answer the question? I have asked would you agree with that question or would you not?

A. I didn't hear the witness state the question that you allege, that you stated he made.

Q. Would you come back now for a moment, sir. I asked you would you agree with that statement or would you not? You may answer that yes or no.

A. I didn't hear the statement.

Q. I am giving it you now. I am asking you to assume that a professor at the University of Illinois said he would not believe a foreman on the job who said under oath that he buried that with tape coating on it, would you agree with him or not if he said that?

A. That is a hypothesis, Judge.

THE COURT: Can you answer the question or can't you?

A. Can I answer it:

THE COURT: Yes.

Q. You can answer it yes or no, sir. You can either agree or you don't agree.

A. I wouldn't agree.

* * * *

Q. And if a man is a craftsman and he is being constantly pushed for speed so that he doesn't even have a chance to make three passes, is his work bad?

MR. KRUECKEBERG: If the court please, there is no evidence excepting Mr. McNagny's testimony that this man was being pushed constantly to make speed and we will object because it assumes a fact not in evidence.

THE COURT: This is cross-examination, let him answer if he can.

A. Despite the fact that the question is a hypothetical question, I will answer it in this way. If the man is a craftsman he would refuse to be pushed because he could walk off the job and get another job more to his liking because there is a pride on the part of the craftsman in the welds that he makes."

* * * *

The pertinent testimony of the witness McLean:

"Q. Mr. McLean, if you were the contractor who was putting the work in and you were responsible for a good and workmanlike job and you asked an inspector who you knew was not a trained engineer if you might go ahead and spring and he said you might, would you think you had no responsibility for springing?

MR. FRUECHTENICHT: There is no evidence to that, Your Honor. We are going to object to the question.

MR. McNAGNY: There isn't any evidence whatever he was ever told by the gas company to spring this line. That was John Dehner's decision. That is what the fact is.

MR. FRUECHTENICHT: That is pure—well—

MR. McNAGNY: We have made a question; if you have an objection, make it.

MR. FRUECHTENICHT: I made the objection on the ground that the question contains implicit within its conclusions and fact which are not in evidence before this jury and it is objectionable for that reason.

THE COURT: Let him answer, if he can.

A. If he were my contact, the only contact on the job with the company and he told me to do it, I would do it.

Q. That wasn't my question. I said you have gone to the inspector and told him you wished to spring it and he had no objection, do you then feel you had no responsibility?

MR. FRUECHTENICHT: That is my point. There is no evidence in this case that anybody from Dehner went to Mr. McBride and said, 'Sir, we want to spring this. May we?' There is no evidence.

MR. McNAGNY: There's no evidence anyone from the gas company told him to spring the pipe. It is Dehner's men pushed it into the trench. There weren't any gas company men working on that line.

THE COURT: Do you know what the question is, Mr McLean?

A. I answered it wrong. I thought I answered it correctly. I think I would have responsibility for springing the line."

We have burdened this opinion by setting forth the entire testimony of the witness Goodwin verbatim from Dehner's brief. The only objection that could remotely preserve any error is "We will object because it assumes a fact not in evidence." The witness Goodwin was an expert consulting gas technologist with extensive background and experience. His direct testimony covered a wide range including welding techniques and the engineering problems in installing this gas main. He had made tests on the other welds on this line.

Welding is certainly an art or science which may be the subject of expert testimony. Both witnesses, McLean and Goodwin, were qualified as expert witnesses who were entitled to give opinion evidence. The acceptance of such opinion evidence is within the sound discretion

of the trial court which will not be disturbed on appeal except upon a showing of abuse. *Linton-Summit Coal Co.* v. *Hutchison,* 232 Ind. 369, 111 N.E. 2d 819 (1953). No abuse is shown here.

The scope of cross-examination of an expert witness is generally broader than that permitted of other witnesses. Hypothetical questions may be used on such cross-examination and the opinion of an expert given may be tested on cross-examination by either omissions or additions to the original hypothetical question or by a completely new statement of facts. The propriety of this technique is well illustrated in *Louisville, New Albany, and Chicago Ry. Co.* v. *Falvey,* 104 Ind. 409, 3 N. E. 389 (1885), where on direct examination the witness testified as to the age of plaintiff and on cross-examination was asked the age of a bystander. See also, *Taylor* v. *Taylor,* 174 Ind. 670, 93 N. E. 9 (1910). Such a hypothetical question on cross-examination of an expert may include facts of which there is some evidence or which may be fairly inferred from the evidence. *Wheatcraft* v. *Myers,* 57 Ind. App. 371, 107 N. E. 81 (1914).

There was other evidence from which it could have been inferred that the speed with which Dehner was working to complete the construction of this pipeline could have been a factor in the defective weld. There was expert testimony of undercutting in this weld which could indicate the weld was made too fast. There was evidence from Dehner's own expert that there were only two passes made on the weld which broke and that good workmanship required three welding passes. There was other expert testimony that the weld causing the explosion had only two welding passes.

Dehner has preserved no reversible error with regard to the quoted testimony of its witness Goodwin on cross-examination.

The witness McLean was an expert industrial engineer with extensive experience and training. He testified on direct exam-

ination on a broad range of subjects including the stresses on this gas line. He also testified regarding the weld where the explosion occurred. On direct examination he indicated agreement with Professor Singer, another expert called by Dehner, regarding the relative strength of the weld in question.

Likewise, with reference to the testimony of the witness McLean, there is not a single objection which sets up anything for us to consider.

We, therefore, find no reversible error under this specification.

### PROPOSITION VIII

Dehner next claims error in regard to the testimony of the witness Carl H. Rohrer, a witness called by Plaintiff-Appellee on cross-examination by NIPSCO:

"Q. What about the welding job out there? How much has the Northern Indiana Public Service Company spent to repair the Dehner job?

MR. KRUECKEBERG: Objection. I don't think this is relevant.

THE COURT: Let him answer if he knows.

A. Up to date it has been approximately $20,000.00.

\* \* \* \*

Q. Is it not a fact that they were there to check installations to private homes and that they had nothing whatever to do with the Dehner job?

MR. KRUECKEBERG: We would like to know whether this witness knows that information before he testifies.

THE COURT: If you know, Mr. Rohrer.

MR. KRUECKEBERG: I think he should be asked if he does know.

MR. McNAGNY: The Judge has already asked him.

A. Obviously, since I wasn't there I have no absolute personal knowledge. I know it was our practice to facilitate the work by the contractor rather than to ask him to push a large gas main under small three-quarter service pipe that goes to the customer's home to be removed temporarily until he lowered the main line under these smaller pipes.

This would facilitate his work, and this, I am assuming, was the case on those three men he talked about this morning.

MR. KRUECKEBERG: We move to strike the answer, Judge. He indicated he doesn't know.

MR. McNAGNY: Your Honor, I believe we are the only ones that have a right to object to it being not responsive, so if that is the only objection I will proceed on to the next question.

THE COURT: Alright.

\* \* \* \*

Q. Mr. Rohrer, you have been asked if the gas company checked this Dehner welder and found him qualified, is that correct?

A. Yes.

Q. In other words, you checked his welds and they were good. Would we be here today if he made the same kind of welds on that pipe sitting in front of you that he made for your inspector?

A. No.

MR. FRUECHTENICHT: We object, Your Honor. It calls for an obvious conclusion from this witness and is highly improper.

THE COURT: Let him answer.

MR. KRUECKEBERG: There is no indication he knows anything about that.

A. The answer is no.

\* \* \* \*

Q. Mr. Rohrer, was there any reason why the Defendant John Dehner, Inc., couldn't have made any tests it wanted to or felt necessary to carry out its obligations under the contract?

MR. FRUECHTENICHT: To which question we will object. The contract speaks for itself with regard to the respective obligations thereunder of the parties, and Mr. Rohrer is not an attorney and it is not his function to interpret the contract at that point.

THE COURT: Overruled.

A. No, sir, none whatever."

Dehner made a series of general objections. These general objections were too vague to raise any question on appeal. *Schoby* v. *Smith,* 142 Ind. App. 483, 235 N. E. 2d 495 (1968) ; *Beaty* v. *Donaldson,* 136 Ind. App. 269, 200 N. E. 2d 233 (1964) ; *Vanosdol, Receiver* v. *Henderson, Adm.,* 216 Ind. 240, 22 N. E. 2d 812 (1939).

A general objection may be sustained only where the evidence is patently not admissible on *any* basis. *Plank, Ex.* v. *Combs,* 84 Ind. App. 446, 151 N. E. 342 (1926). There ▮ are numerous cases to this effect. Some are: *Healey* v. *Healey,* 123 Ind. App. 155, 109 N. E. 2d 101 (1952) ; *Lautman* v. *Pepin,* 26 Ind. App. 427, 59 N. E. 1073 (1901) ; *Burks* v. *Walters,* 127 Ind. App. 358, 141 N. E. 2d 872 (1956) ; and *Altmeyer* v. *Norris,* 124 Ind. App. 470, 119 N. E. 2d 31 (1953).

The examining party is the only party who, solely on ▮ the basis of unresponsiveness, is entitled to have testimony stricken. *McCord* v. *Strader,* 227 Ind. 389, 86 N. E. 2d 441 (1949).

A party who is not examining a witness cannot use a motion to strike as a means of objection to a question after it has been answered. *Prudential Ins. Co. of America* v. *Robbins,* ▮ 110 Ind. App. 172, 38 N. E. 2d 274 (1941). The party cannot wait until the answer is given and then move to strike. *Ziegler* v. *Tipton Lumber Co.,* 128 Ind. App. 249, 147 N. E. 2d 679 (1958). The motion to strike by a non-questioning party must also present a valid ground for the exclusion of the answer. *Kraft* v. *Himsel Stock Yards,* 127 Ind. App. 238, 139 N. E. 2d 569 (1957).

In regard to the motion to strike in *Southern Indiana Gas and Electric Co.* v. *Gerhardt,* 241 Ind. 389, 172 N. E. 2d 204 (1961), our Supreme Court stated such must be specific and limited strictly to the testimony to which it is properly applicable. The court added:

"It would be error for a court to sustain too broad a motion, thus striking out relevant and competent testimony.

.* * * Such motions to be sustained must be very concise and specific as to the testimony to go out."

Examined in light of these authorities there was no reversible error in not sustaining the motion to strike.

In regard to the contentions of Dehner under both Propositions VII and VIII the statement of our Supreme Court in *State* v. *Monninger*, 243 Ind. 174, 182 N. E. 2d 426 (1962), is highly relevant:

> "It is our considered opinion that the position of appellee is correct for it is well settled that error in admitting evidence at the trial is not available on appeal where ▮▮▮ the complaining party submits evidence to substantially the same effect."

All of the parties, including Dehner introduced extensive evidence, including expert testimony relating to the precise subject matter considered under this proposition.

## PROPOSITION IX

NIPSCO tendered and the court gave instruction number 3 which states:

> "The Defendant, Northern Indiana Public Service Company, cannot be guilty of negligence in failing to inspect the work of the Defendant, Dehner, unless the Defendant Dehner, was guilty of negligence in the performance of the work."

Dehner objected:

> "Instruction No. 3 is contrary to law inasmuch as it is entirely possible for the weld to have been made pursuant to the instructions of the defendant, NIPSCO, and made in an incompetent manner by virtue of the inadequacy of said instructions, and the defendant, Northern Indiana Public Service Company, therefore negligent in failing to inspect to see whether the weld was adequate. The instruction, on the other hand, suggests that defendant Dehner would have to have been negligent in order for defendant, NIPSCO, to have been negligent. Furthermore, the instruction omits consideration of the fact that acceptance and use of the line

by NIPSCO was and could be the proximate result of the occurrence, if acceptance was with knowledge of the condition of the line."

The above tendered instruction number 3 is a statement of the law limited to a narrow aspect of negligence, i.e., negligence in failing to inspect.

Appellant cites *Harper* v. *James*, 246 Ind. 131, 203 N. E. 2d 531 (1965) ; *Burroughs* v. *Southern Colonization Co.*, 96 Ind. App. 93, 173 N. E. 716 (1932) ; *Slagell* v. *Lester*, 125 Ind. App. 257, 123 N. E. 2d 923 (1955), all of which involve mandatory instructions. The Appellant also cites *Vance* v. *Wells*, 129 Ind. App. 659, 159 N. E. 2d 586 (1959), which is more in point here for Appellee. Examined in light of *Vance* v. *Wells* instruction number 3 is certainly not mandatory.

It is likewise necessary for the Appellant Dehner to specifically raise the question of the mandatory nature of an instruction in a timely objection. *General Electric Company* v. *Dorr*, 140 Ind. App. 442, 218 N. E. 2d 158 (1966). This obviously was not done here.

## PROPOSITION X

The court gave NIPSCO's instruction number 2, which stated:

"I instruct you that he law did not impose upon the defendant Northern Indiana Public Service Company the duty to use every possible precaution to prevent the fire or explosion complained of. It was not an insurer of the safety of the plaintiff. It was only required to use that degree of care which a person of ordinary prudence would have used under the same or similar circumstances.

If you find that the weld which failed, as alleged in the complaint, was not made by an employee of the defendant Dehner with reasonable care under the circumstances and such negligence, if any, was a proximate cause of the plaintiff's injuries, and you further find that the Defendant Northern Indiana Public Service Company was guilty of negligence in failing to properly inspect the weld or super-

vise the construction at the time and place complained of, and was not guilty of any other act of negligence charged in the complaint, then I instruct you that you cannot return a verdict in favor of the plaintiff and against the Defendant Northern Indiana, Public Service Company, without also returning a verdict in favor of the plaintiff and against the defendant Northern Indiana Public Service Company, without also returning a verdict in favor of the plaintiff and against the Defendant Dehner."

To which Dehner objected:

"Instruction No. 2 omits the consideration of acceptance, and is therefore contrary to law, inasmuch as acceptance by Northern Indiana Public Service Company and use of the line by Northern Indiana Public Service Company could be a proximate cause of the occurrence complained of, if they had knowledge, actual or imputed of the circumstances existing."

As a general rule, acceptance by NIPSCO would not relieve Dehner from liability to Appellee unless Dehner's work did not result in an imminently dangerous condition. In *Holland Furnace Company* v. *Nauracaj*, 105 Ind. App. 574, 14 N. E. 2d 339 (1938), this court held that lack of privity between contractor and injured party did not preclude recovery where the object constructed was "imminently dangerous". See also, *J. I. Case* v. *Sandefur*, 245 Ind. 213, 197 N. E. 2d 519 (1964). The general rule in this regard is well stated in 13 A.L.R. 2d 233 as follows:

"One of the exceptions to the rule of non-liability of the contractor is that if the thing constructed is inherently or imminently dangerous, or if the contractor's acts result in an imminently dangerous situation the natural or probable consequences of which, or the inevitable result of which, would be injury to persons other than the contractee who after the acceptance of the work or structure by the contractor are likely to come in contact therewith, the liability of the contractor for the consequences of his negligent act is not limited to the contractee but extends as well to any third person who receives injury or damage as a direct result of such act."

In this context the court also properly gave Dehner's instruction number 1, which stated:

"If the occurrence complained of solely and proximately resulted from, 1) the specification of inappropriate procedures by Northern Indiana Public Service Company, or 2) from the failure of Northern Indiana Public Service Company to specify appropriate procedures and properly engineer the line, or 3) from the failure of Northern Indiana Public Service Company to adequately qualify and test the welder or the welds, if you find that it retained sole responsibility to so qualify and test the welder and the welds, or 4) from any failure to furnish appropriate materials; and,

If you further find that Northern Indiana Public Service Company was negligent therein, such omissions could not be chargeable to John Dehner, Inc."

Dehner's instruction number 1 was given on the basis of its theory of the case and NIPSCO's instruction number 2 was given on its theory of the case.

Likewise the court gave Dehner's instruction number 2, which stated:

"One who engages another to perform work or furnish labor in connection with the work in which the former is skilled and over which he retains supervision, engineering and inspection, is bound to furnish the other, or the employees of the other, with adequate plans and directions, on which the laborers may rely; and the person who furnishes such engineering, supervision and inspection and retains and exercises control thereover, is responsible for the results of such supervision, engineering, direction, control and inspection and for the lack thereof."

Likewise the court gave Dehner's instruction number 4, which stated:

"A contractor who furnished labor to perform work according to plan, direction, instructions, specifications or certifications of another may rely thereon, and is not chargeable with any inadequacy or insufficiency of such plans, directions, instructions, specifications or certifications, nor are his employees, except where such plans, directions, instructions, specifications or certifications are so defective that a reasonable person would not rely upon them."

And also gave Dehner's instruction number 6, which stated:

"When one is in the business of selling and distributing natural gas he may not relieve himself of the obligation to see that its lines are installed safely by entering into an independent contract, but rather it continues responsible to see that the line is properly and safely installed."

In this same view the court gave Dehner's instruction number 7, which stated:

"If the overall supervision of the work, and the engineering of the work was provided by Northern Indiana Public Service Company and the defendant John Dehner, Inc., undertook to furnish labor and equipment under the supervision of Northern Indiana Public Service Company, the defendant John Dehner, Inc., is not responsible for failures or defects occurring or appearing afterwards as a result of the wearing effects of the elements, or for the consequences of uses not contemplated at the time of construction.

Workmen are not expected to be insurors of the everlastingness of their work, or that the materials and workmanship they used will be wear-proof against the elements."

It is abundantly clear that Dehner's theory of defense was well covered by the instructions given by the trial court. It is equally clear that NIPSCO's defense theories were likewise covered by the instructions.

### PROPOSITION XI

Dehner contends the verdict is not sustained by sufficient evidence and is contrary to law. Under these two contentions it groups a total of 39 sub-parts, most of which are duplications of matters already considered in this opinion. It is, however, necessary to summarize with all inferences most favorable to appellee, the pertinent evidence with reference to the liability of both appellants.

The only welder who worked on the installation of the section of the gas line in question was Dehner's employee. The weld at the explosion site and at least one other on the same line had not been wrapped, contrary to the elementary princi-

ples of good workmanship. There was no wrapping on either side of the weld at the explosion site. This testimony came from at least three witnesses. NIPSCO's inspector on the job testified there were no plans for the installation of this line. Mr. Dehner testified his company was never furnished any plans or specifications for this job by NIPSCO. The wrapping of the welds was Dehner's responsibility. Dehner had been instructed to wrap the weld in question. Dehner's welder testified that three welding passes were necessary. There was testimony from other witnesses that he had made only two passes.

Henry Dehner, who was the foreman for Dehner on this job, testified that he was aware of the danger if the line was not properly laid. Dehner's welder had passed the gas company's test. He knew of no one from NIPSCO who inspected the work of the welder on this job. This was the welder's first job for Dehner. Mr. Dehner was not a welder. None of the inspectors on this job for NIPSCO were welders. No one other than Mr. Dehner was to check the welds for Dehner to see that they were wrapped. At the explosion site the pipe had been sprung about 20° to go around an angle, no elbow was used at that point. NIPSCO furnished the materials and made the decision to spring the pipe at the explosion site.

There was testimony that the expected life of pipe like that used in this main was in excess of 50 years, possibly 75 years. The weld in question which broke showed the metal had not completely fused. A weld, if properly done, will be stronger than the pipe because the material at the weld site is thicker. The pipe at the explosion site had rusted. Between the time when the line was installed in 1951 and this explosion in February, 1966, at least two of the welds had broken causing NIPSCO to dig up the line. The pipe in question was made to withstand at least 900 pounds of pressure, the greatest amount of pressure on this line was about 155 pounds. By merely looking at the outside of a weld one cannot tell whether

the welder has done a good job, it may look good and not be penetrated. The break on this weld came right down the center of it. Dehner was responsible to see that the work was done in a workmanlike manner. Because of the bend in the pipe it had been under constant stress since 1951. A good welder can tell whether he is getting a proper weld.

Mr. Hunter, a welding inspector for Panhandle Eastern Pipeline Company, an expert, examined the weld where the explosion occurred and testified it was probably the poorest weld he had seen in an existing pipeline. It was not done in a good and workmanlike manner. He testified without contradiction that a proper weld is much stronger than the parent metal on each side. Hunter further stated the weld which broke showed improper penetration, non-fusion and a definite undercut which is unacceptable anywhere on the outside of the pipe.

Mr. McBride was inspector of this job. He was not a qualified welder. Dehner had done lots of other work for NIPSCO and they depended on Dehner's reputation and experience to do a workmanlike job. Dehner was to wrap the welds. Dehner was relied on to weld properly. The supervision of the job and the directions to the workmen were entirely under Dehner's supervision.

Mr. Peletier, Vice President of NIPSCO for Engineering, testified he had never seen a weld break the way this one did. He also testified the accounting department set 50 years for the life of a pipe but some lines actually lasted longer. A weld would have an equal life or longer. The broken weld showed no evidence of being subjected to pressures or stresses.

Mr. Coleman, a welder with 40 years experience, examined the weld at the explosion site as well as plaintiff's exhibit 16 and testified they revealed improper penetration, no root pass visible, non-fusion and external undercutting and detectable pockets of gas or slag in the weld. He testified that he had never seen as poor a weld in service on any line. This testi-

mony was duplicated by Mr. Litchfield who trains apprentice welders.

Mr. Conwell, the welder for Dehner, testified that one of the welds at the explosion site was not penetrated. He was an experienced welder hired by Dehner for this job. He said a good weld requires penetration that goes to the bottom of the root.

Dehner called Mr. Singer, a professor at the University of Illinois, who was an expert in Metallurgy, including welding. He testified that it would be a mistake not to wrap a weld. He would not believe someone who told him that this particular pipe had been put in the ground with an airtight wrap. He would not pass a weld made like that in plaintiff's exhibit 16. If the supervisor were not a welder and didn't know whether the welds were good, Mr. Singer would question as to how he got his job as supervisor. Mr. Singer found the weld which failed had about 75% penetration. He would expect a contractor to accomplish 100% penetration for a good and workmanlike weld in front of people's homes.

There was also direct expert testimony that gas in inherently dangerous and that the specifications provided to the contractor were not adequate.

Dehner's employees were instructed to be extremely cautious while putting the line in.

The liability of a contractor who constructs a gas main is within the scope of the rule set forth in *Peru Heating Company* v. *Lenhart*, 48 Ind. App. 319, 95 N. E. 680 (1911). Also, in *Lebanon Light, Heat and Power Co.* v. *Leap*, 139 Ind. 443, 39 N. E. 57 (1894), our Supreme Court held both the construction contractors and gas company liable for the negligent manner in which a gas pipe was laid.

A good example of the application of these principles in a gas explosion case is *Paul Harris Furniture Company* v. *Morse*, 10 Ill. 2d 28, 139 N. E. 2d 275 (1956), where the Illinois Supreme Court stated:

"The general rule is that where an independent contractor is employed to construct or install any given work or instrumentality, and has done the same and it is accepted by the employer and the contractor discharged, he is no longer liable to third persons for injuries received as a result of defective construction or installation. *Empire Laundry Machinery Co.* v. *Brady,* 164 Ill. 58, 45 N. E. 486. This rule, however, is subject to certain well recognized exceptions whereby a contractor may be held liable even after acceptance of his work by the contractee (1) where the thing dealt with is imminently dangerous in kind, such as explosives, poisonous drugs and the like, (2) where the subject matter of the contract is to be used for a particular purpose requiring security for the protection of life, such as a scaffold, and (3) where the thing is rendered dangerous by a defect of which the contractor knows but deceitfully conceals, and which causes an accident when the thing is used for the particular purpose for which it was constructed. *Empire Laundry Machinery Co.* v. *Brady,* 164 Ill. 58, 45 N. E. 486; *Colbert* v. *Holland Furnace Co.,* 333 Ill. 78, 164 N. E. 162, 60 A.L.R. 353; *Healey* v. *Heidel,* 210 Ill. App. 387. We are of the opinion that this case clearly comes within the first exception, if not also within the second and third.

That the storage of liquid propane gas is imminently dangerous cannot be seriously disputed." p. 282, 283.

The Restatement of Torts 2d, § 417 states:

"One who employs an independent contractor to do work in a public place which unless carefully done involves a risk of making the physical condition of the place dangerous for the use of members of the public, is subject to liability for physical harm caused to members of the public by a negligent act or omission of the contractor which makes the physical condition of the place dangerous for their use."

Appellant Dehner questions the sufficiency of the evidence to sustain the verdict on appeal. We will only examine the record to see if there is any evidence or any reasonable or logical inferences which may be drawn from the evidence, which, if believed by the jury, will sustain the verdict. We will not weigh the evidence. *Kempf* v. *Himsel,* 121 Ind. App. 488, 98 N. E. 2d 200 (1951) ; *Peckham*

v. *Smith, A Minor,* 130 Ind. App. 452, 165 N. E. 2d 609 (1959) ; *Gamble, et al.* v. *Lewis,* 227 Ind. 455, 85 N. E. 2d 629 (1949) ; *Indiana Ins. Co.* v. *Handlon,* 216 Ind. 442, 24 N. E. 2d 1003 (1940).

Since the verdict was against the Appellant Dehner which had the burden to prove its defenses no question is raised as to the insufficiency of evidence concerning these defenses. *Rowe* v. *Johnson,* 223 Ind. 289, 60 N. E. 2d 529 (1945), and *City of Indianapolis, etc.* v. *Walker,* 132 Ind. App. 283, 168 N. E. 2d 228 (1961). In regard to these defenses of Appellant Dehner we must only consider whether the verdict is contrary to law. In this regard we only consider the evidence most favorable to Appellee together with all reasonable inferences therefrom. Unless the evidence is without conflict and leads to one conclusion and the trial court reached a contrary conclusion, the verdict must be affirmed. See *City of Indianapolis, etc.* v. *Walker, supra.*

It is for the trier of fact, in this case the jury, to reconcile, reject, or accept part of disputed or conflicting testimony even when made by the same witness, including a party witness. The jury as trier of fact is the judge of the weight and credibility. This court will not judge weight or credibility. It will not weigh the evidence on appeal. We will look only to the evidence most favorable to appellee and the inferences most favorable therefrom. *City of Indianapolis* v. *Bates,* 137 Ind. App. 227, 205 N. E. 2d 839 (1965).

The jury could have found that Dehner was an independent contractor and rejected its so-called furnished or loaned servant defense and its other defenses.

Dehner's charge that the verdict is contrary to law is subject to the general rule stated by our Supreme Court in *Pokraka, et al.* v. *Lummus Co.,* 230 Ind. 523, 104 N. E. 2d 669 (1952), that we will consider only the evidence most favorable to Appellee and it only where the evidence is without conflict and can lead to but one conclusion and

the trial court reached an opposite conclusion will the verdict be reversed as contrary to law. See also, *Hinds, Executor* v. *McNair, et al.*, 235 Ind. 34, 129 N. E. 2d 553 (1955). A careful examination of the record in this case reveals the verdict is sustained by sufficient evidence and is not contrary to law.

*PROPOSITION XII*

NIPSCO tendered and the court gave Instruction number 6:

"If you find that the pipes laid by Defendants by the accident scene if properly installed should have functioned without danger to the general public under the conditions then and there existing for a period in excess of fifty years, and if you further find that such pipes did not so function, then I instruct you that you may consider these facts in determining whether the defendants were guilty of negligence."

To which Dehner objected:

"Instruction No. 6 permits a comment on the evidence by the Judge to the effect that the testimony regarding the length of the life of the line as being in excess of 50 years is of particular significance and, therefore, gives an undue preference to the position of the defendant, NIPSCO, and a prejudice to the position of the Defendant, Dehner. Furthermore, it suggests that a warranty or guaranty existed and that the defendant Dehner would be and could be considered responsible for any matters that occurred within the line within the period of time stated, even though the line was not engineered by defendant Dehner."

In *Jones* v. *Kasper,* 109 Ind. App. 465, 488, 33 N. E. 2d 816, 824 (1941), this court stated:

"It is within the province of the trial court to properly refer to certain facts without assuming that they have been found and to instruct the jury as to the law applicable if those facts are found."

See also, *Vogel* v. *Ridens,* 112 Ind. App. 493, 44 N. E. 2d 238 (1942).

There was expert testimony that the expected life of a 12 inch gas main of the type in question was in excess of 50 years and possibly 75 years.

We therefore find no reversible error in giving instruction number 6.

PROPOSITION XIII

NIPSCO tendered and the court gave instruction number 9, which stated:

"If you find that the Defendant, Northern Indiana Public Service Company, failed to discover defective workmanship on the part of John Dehner, Inc., in the weld at Broadway and Kinsmoor, I instruct you that such a failure on the part of Northern Indiana Public Service Company would in no way excuse the Defendant John Dehner, Inc., from its responsibility, if any, to the public for negligent work."

To which Dehner objected:

"It fails to take into consideration the fact of acceptance and use of the line, and it fails to take into consideration the requirement that John Dehner had knowledge of the fact that the condition caused the line to be immediately and imminently dangerous."

This instruction seems perfectly consistent with the statement in *Holland Furnace Co.* v. *Nauracaj, supra*. The jury could have found from the evidence that Dehner left the line in a defective condition imminently dangerous to third persons. This rule of law has a very sound basis in order to protect the public from disasters such as the one here.

In regard to instructions we have made a careful examination of all instructions tendered and given. It appears the Appellee tendered 9 preliminary instructions, of which the trial court gave 8 and Appellee also tendered 12 instructions, of which the trial court gave nine. NIPSCO tendered 10 instructions and the trial court gave nine. Dehner tendered 10 instructions and the trial court gave 8 of them.

Considering all the instructions given, we find that the trial court fully and adequately instructed the jury in this case.

## PROPOSITION XIV

On direct examination of Mr. Hunter, by the plaintiff, there were the following questions, answers and objections:

"Q. As an inspector I will ask you whether or not you in your opinion, would have accepted the weld shown on 14B? [The weld where the explosion occurred]

MR. FRUECHTENICHT: To which question we will object, Your Honor. What this gentleman indicates as an inspector or about his particular method of acceptance has nothing to do with the manner and method which was in existence in 1951 which was acceptable to NIPSCO, the co-defendant in this case.

MR. HAYNIE: I will reframe the question.

Q. You had been an inspector prior to 1951, had you not?

A. Yes, sir.

Q. Let's go back to 1951. As an inspector in 1951 do you have an opinion as to whether or not you would have accepted that weld.

A. Definitely not.

MR. FRUECHTENICHT: To which question we will object. Once again there is no representation he is an inspector for NIPSCO. This witness has not indicated he is familiar with NIPSCO's standards and therefore any opinion on his part is totally irrelevant to this case.

MR. McNAGNY: Let me say NIPSCO would like to hear this and we make no objection.

MR. FRUECHTENICHT: The objection stands, Your Honor.

MR. HAYNIE: Let me ask a preliminary question.

THE COURT: All right.

Q. You say you have been an inspector for Panhandle Eastern?

A. Yes, sir.

Q. Is that the same company that brought the gas here in 1951?

A. They furnish gas to them now. I presume that they did, yes.

Q. And their pipes run throughout the length and breadth of the United States?

A. From Texas to Detroit.

Q. Now, I am going to ask you again, do you have an opinion, basing it in the year 1951, what you knew then as an inspector, whether or not—do you have an opinion as to whether or not this would have passed your inspection?

MR. FRUECHTENICHT: We make the same objection, Your Honor. It is totally irrelevant.

THE COURT: Overruled. Let him answer.

A. No, sir, I would not have accepted it.

Q. Tell the jury what kind of test you conducted on that piece of pipe (Plaintiff's Exhibit No. 22) and what the outcome of that test was?

MR. FRUECHTENICHT: The Defendant Dehner will object to any tests made on any weld other than those involved in this action. What sort of tests: No one from Dehner was present at the time these tests were made. We have no idea under what conditions they were made. We cannot possibly determine this man's veracity, the conditions under which the test was made, whether they were made properly. We are absolutely helpless in this regard. And aside from that and most important, the weld in question here and for that reason we are objecting to any testimony for the reason it is patently irrelevant. Object further for the reason that the testimony has shown the weld did break, was subjected to conditions over a fifteen year period which cannot possibly be duplicated, and there is nothing in this man's testimony to show they were duplicated.

MR. McNAGNY: I would like the record to show there is no objection to any testimony of this man by the gas company.

MR. HAYNIE: Have the record show it is my understanding these pieces have been tested by the Defendant Dehner. We are offering this not for the purpose of proving what occurred in the weld that broke at the time of the explosion. The welder has testified that he was welding the same pipe,

actually the same end of each one of these Exhibits 14A and 14B, that he was using the same procedure, that he was using the same care.

MR. FRUECHTENICHT: There is no testimony however, that this weld which this man is now being asked to examine was subjected to the same conditions that the weld in question was and as a consequence any examination of this weld has to be irrelevant because of the absence of those specific conditions which are vital in this case.

MR. HAYNIE: I would have no objection to, Your Honor, suggesting to the jury this merely goes to the question of the weight. They may consider the fact—

MR. FRUECHTENICHT: It is irrelevant and it is not a matter of weight.

THE COURT: Overruled. Ladies and gentlemen, you may consider it for what it is worth.

Q. Tell them what test you conducted and what the test revealed.

A. As you can see, we put it in a hydraulic bending machine and bent the strap, which in a proper weld should have went to 180 degrees, and pipe of this thickness probably would have taken eight or ten thousand pounds per square inch pressure to bend.

Q. Will you show the jury what a weld should bend to?

A. This is approximately 180 degrees, more or less, probably less, without a break. As you can see, this one broke.

Q. All right.

A. It also has slag inclusion in it and porosity.

MR. HAYNIE: We now offer in evidence this Plaintiff's Exhibit No. 22.

MR. FRUECHTENICHT: Objection on the same grounds as before. The matter is clearly irrelevant. Once again, we have no idea that this is the specific pipe that was removed from that location and have no control over it whatsoever, and I repeat the objection made before.

MR. McNAGNY: No objection on the part of the gas company.

THE COURT: Overruled. Let it be admitted and shown to the jury.

Q. Tell this jury frankly, Mr. Hunter, what do you think of that weld?

MR. FRUECHTENICHT: We object, he has already given his opinion and explained it to the jury and this is repetitious. This can only be prejudicial to the Defendant Dehner.

THE COURT: Overruled. You may answer the question.

A. That is probably the poorest weld I have ever seen in an existing pipe line."

"MR. HAYNIE:

Q. Mr. Rohrer, I believe I was asking you about some welds which were taken from either side of the pipe that broke at the weld on Broadway and Kinsmoor?

A. Yes, sir.

Q. Were these pipes, these welds, taken by you for the purpose of destructive tests?

A. Yes, sir.

Q. And were you kind enough to make them available to men that I had chosen to have make destructive tests on them?

A. Yes, sir, this is so.

Q. Now I am going to ask you if the parts—

(Plaintiff's Exhibit No. 15 marked for identification by the reporter.)

Q. Is this box marked Plaintiff's Exhibit No. 15, did you make this portion of those pipes from either side available for tests?

A. Yes, sir.

Q. And you had them available yourself for destructive tests?

A. Yes.

MR. KRUECKEBERG: Are you going to offer them before you question him about them?

MR. HAYNIE: I would be happy to.

MR. KRUECKEBERG: We would like to have an opportunity to object to their offer.

MR. HAYNIE: Certainly.

Q. And these are the parts, with the exception of that portion of them which have been taken for tests, is that correct?

A. Yes.

MR. HAYNIE: The plaintiff now offers in evidence Plaintiff's Exhibit No. 15, consisting of eight or nine pieces of metal pipe.

MR. McNAGNY: No objection.

MR. KRUECKEBERG: Your Honor, we would like to object to the introduction of these pipes. There is nothing shown that these pipes were a contributing part to this occurrence. These pipes served fifteen years; they didn't break and would have continued to serve thereafter. I don't see how they are relevant to this matter.

MR. HAYNIE: I want to make my point clear. I am not offering these to show they are any part of the occurrence of the explosion. The purpose of this offer is to show the type of welding that went into this line by the welder, Don Conwell. We have before us the pipe that broke. None of us are going to make destructive tests on that as evidenced by the fact it is here. We did have something we could perform destructive tests on, and we have. And we are not offering these for the purpose of showing this was the pipe that broke. We are offering it for the limited purpose, and I would be happy to have Your Honor instruct the jury we are offering it only for the purpose of showing the type of workmanship that went into the weld."

Again we have set forth verbatim every word of testimony contained in Dehner's brief under this proposition to demonstrate the sterility of their contentions in this regard.

The witness Hunter was a lifelong welder with many years of experience as a welding inspector for Panhandle Eastern Pipeline Companies. He testified on direct examination at length and in detail as to the welding tests which were available in 1951. He testified that a good welder can tell whether he is getting a proper weld. A proper weld will be stronger than the adjacent pipe.

On cross-examination by Dehner the expertise involved in good and workmanlike welding was explored further with the witness Hunter.

Plaintiff's Exhibit 15 was a group exhibit of sections of welds which were immediately adjacent to the north and south of plaintiff's exhibit 14A and B, the weld which was the cause

of the explosion. What we have said under Proposition IV regarding the admissibility of plaintiff's exhibit 16 is adequate to dispose of all contentions as to exhibit 15. It was properly admitted into evidence. The remaining objections of Dehner are at best vague and indefinite and are without merit.

In *Baber* v. *Rickart*, 52 Ind. 594, 597 (1876), our Supreme Court stated:

> "The fact to be proved was, whether the machine performed in the manner and place specified in the warranty. Evidence as to the manner in which such machinery performed at another place would tend to prove the capacity of the machine to perform at the place specified in the warranty. The weight of such evidence would greatly depend upon the difference in the soil and the other surroundings of the two places. Such a machine might perform well in one character of soil, and yet would fail in another and different character of soil. *Evidence ought not to be excluded because it is entitled to but little consideration or weight. The difference between the competency and weight of evidence is marked and clearly defined. That which is competent, whether weak or strong, should be admitted.*" (emphasis supplied)

On direct examination Dehner's own expert witness, Mr. Singer, testified almost exclusively on tests conducted by him on adjacent welds.

Certainly there is substantial evidence from which the jury could have found for the Plaintiff-Appellee Otis on her complaint against both Appellants here. Likewise, the jury in arriving at its verdict could properly reject the defenses of both Appellants, which it obviously did.

From a careful examination of the record in this appeal it appears to this court that the merits of this case were fairly tried and a just result reached.

Every reasonable effort has been made by the Appellant Dehner to demonstrate error but we have been unable to discover any reversible error presented on this appeal. In order to fully inform ourselves we have carefully considered the briefs submitted by all the parties and the writer has read all

of the original evidence in the transcript which contains a total of 1256 pages.

The verdict is supported by competent and substantial evidence.

There is no reversible error. Therefore, the judgment should be and hereby is affirmed. Costs v. Appellants.

Pfaff, C.J., and Hoffman, J., concur. White, J., concurs in result with opinion.

## CONCURRING OPINION

WHITE, J.—My brother judge has executed with commendable dispatch and skill the herculean task imposed on him by the statute which mandates us to "give a statement in writing of each question arising in the record . . . and the decision of the Court therein". *Hunter* v. *Cleveland, etc., Ry. Co.*, 202 Ind. 328, 174 N. E. 287 (1930). It is to be hoped that the electorate will approve, at the next general election, the proposed judicial reform amendment (H.J.R. 6, Acts 1967, ch. 375, p. 1359) to Article VII of the Constitution of Indiana which will, *inter alia*, repeal the constitutional imposition of that duty upon the Supreme Court and not impose it upon the Court of Appeals which it will create to replace this court. Thereafter, presumably, the opinions written by justices and judges exercising appellate jurisdiction will discuss only those alleged errors of trial courts which the writing jurist feels will make a constructive contribution to the administration of justice.

Of the fourteen propositions Judge Sharp was required to discuss, only that one dealing with the validity of the advance payment device employed by NIPSCO and appellee, and whether its effect was prejudicial to NIPSCO's co-appellant, possesses sufficient novelty and possibility of error to be worthy of an opinion. In that portion of the opinion, I unreservedly concur.

The rulings of the trial court involved in the remaining propositions, even though some may have been technically

incorrect, did not deprive either appellant of a fair trial. Under the provisions of Ind. Acts 1881 (Spec. Sess.), ch. 38, § 659, (Burns IND. STAT. ANN. § 2-3231), we could not have reversed for any mere technical error when the merits of the cause were thus fairly tried and determined. In concurring in the result only, I do not intend to express disapproval of the opinion's disposition of any alleged error, but merely wish to avoid approving any trial court ruling or jury instruction in the abstract, when, as I believe, the possibility exists that in the context of a different case a different statement might be more appropriate.

NOTE.—Reported in 250 N. E. 2d 378.